No. 03–06–0186

Filed July 10, 2007.
IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

SOLAI & CAMERON, INC. a/k/a SOLAI )    Appeal from the Circuit Court of
& CAMERON TECHNOLOGIES and )     the 12th Judicial Circuit
COMTEL TECHNOLOGIES, )    Will County, Illinois,
PLAINFIELD COMMUNITY )
CONSOLIDATED SCHOOL DISTRICT )    Nos.   02–CH–1303
202 for the use and benefit of SOLAI & )            02–CH–1304
CAMERON, )            02–L–00652
              )            02–L–627
      Plaintiffs, )            03– CH–0001
              )            03–CH–1577
        v. )            03–CH–1665
              )            03–CH–1715
PLAINFIELD COMMUNITY )            03–CH–1845
CONSOLIDATED SCHOOL DISTRICT )            03–CH–1851
NO. 202, PAUL H. SCHWENDENER, )            03–CH–509
INC. and AMERICAN HOME )            04–CH–0578
ASSURANCE COMPANY, )            04–CH–0579
              )            04–CH–1573
      Defendants )            05–LM–0046, cons.
              )
(Paul H. Schwendener, Inc., Counterplaintiff )
and Third-Party Plaintiff-Appellant v. )
Solai & Cameron, Inc., Counterdefendant, )    Honorable
and Hartford Fire Insurance Company, )    Herman S. Haase,
Third Party Defendant-Appellee). )    Judge Presiding.

JUSTICE WRIGHT delivered the opinion of the court:

Paul H. Schwendener, Inc. (PHS), appeals from an order of the circuit court of Will County

granting partial summary judgment in favor of Hartford Fire Insurance Company (Hartford) and Solai

& Cameron, Inc. (S&C).[1] We affirm and remand.

## I. BACKGROUND

On April 5, 2001, Plainfield Consolidated School District No. 202 (Plainfield) hired PHS as the general contractor to build Plainfield's tenth and eleventh elementary school facilities, a fourth middle school facility, and additions to the second high school facility. The general contract required PHS to substantially complete all of the school projects by July 15, 2002.

PHS entered into subcontracts dated June 25, 2001, with S&C for the electrical work on the fourth middle school facility (Fourth Middle School Project) and the second high school additions (Second High School Project). Section 2.c. of the S&C electrical subcontracts provides, in relevant part:

> "If during the course of the project, this subcontractor continually fails to properly execute his responsibilities, the General Contractor shall issue a three (3) day written notice identifying this condition. If after this three (3) day notice is issued, subcontractor continues to fail in properly executing his responsibilities, the General Contractor shall have the right to properly complete this subcontract with its own or other forces. All costs for the General Contractor to then complete this subcontract shall be charged to this subcontractor."

S&C, as "Contractor," secured performance bonds dated June 18, 2001, from Hartford, as "Surety," corresponding to each electrical subcontract, for the benefit of PHS, as "Owner," under the

---

[1] S&C joined in Hartford's motion for partial summary judgment and the partial summary judgment ruling was also in favor of S&C, with regard to the surety bond issues. PHS and S&C's claims against each other remain pending in the circuit court, as well as claims by other subcontractors in the underlying consolidated causes of action.

terms of the performance bonds. The performance bonds provide, in relevant part:

"3 If there is no Owner Default, the Surety's obligation under this bond shall arise after:

3.1 The Owner has notified the Contractor and the Surety at its address \*\*\* that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later that fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

4. When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1 Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

4.2 Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds, executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages *** in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

.2 Deny liability in whole or in part and notify the Owner citing reasons therefor.

5. If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after

4

receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Subparagraph 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner."

The working relationship between PHS and S&C began to deteriorate in March 2002. By letter dated March 20, 2002, PHS sent a letter to S&C, with a copy to Hartford, regarding S&C's inadequate performance on both electrical subcontracts. The letter contained the three-day notice to comply required by section 2.c. of the S&C electrical subcontracts. The letter also stated, "please note that a copy of this notice to comply has been sent to your bonding company as required in Section 3.1 of the Performance Bond and serves as their notification of default."

On March 25, 2002, PHS sent a second letter to S&C, with no indicated copy to Hartford, concerning S&C's failure to properly perform on both electrical subcontracts. This letter threatened to remove S&C from both school projects unless substantial improvements were made in the following week. The letter discussed a March 27, 2002, meeting to review S&C's progress on the projects.

PHS and Hartford communicated by telephone on April 2, 2002, regarding S&C's performance on the electrical subcontracts. On April 12, 2002, PHS retained Nu-Line Electric Co., Inc. (Nu-Line), to consult on the status of S&C's unfinished work.

Pursuant to the terms of the electrical subcontract, by letter dated May 1, 2002, PHS notified S&C it had 24 hours to properly man and equip the Second High School Project or PHS would

complete the electrical subcontract. PHS sent a copy of this letter to Hartford. On May 2, 2002, Hartford's claim representative telephoned PHS and agreed to discuss the situation with S&C. By letter of May 6, 2002, Hartford indicated to PHS that S&C would meet the deadlines and "make any necessary improvements to complete the remaining work on both projects."

On May 9, 2002, PHS sent a letter to S&C, with a copy to Hartford, acknowledging that S&C would be expected to complete all electrical work according to the previous schedule. The letter also indicated that PHS would be "supplementing" S&C's work force on the Fourth Middle School Project by using additional electricians to perform designated work. PHS also sent a letter to Hartford on May 9, 2002, informing Hartford that S&C "continues to fail to meet" scheduled deadlines.

PHS identified Nu-Line as the company selected to supplement the electrical work on the Fourth Middle School Project in a May 14, 2002, letter to S&C. PHS did not send a copy of this letter to Hartford. The May 14, 2002, letter states, in part: "Also, I told you Nu-Line would continue to take over areas of your work responsibility whenever we are certain your crew is not able to start areas of work on time." (Emphasis in original.)

PHS and Nu-Line entered into a subcontract dated May 21, 2002, for electrical work on the Fourth Middle School Project with terms similar to the S&C electrical subcontract. Nu-Line signed the subcontract on May 28, 2002, and PHS signed on June 3, 2002.

On June 2, 2002, PHS back charged S&C's subcontract balance. Both S&C and Nu-Line continued to work on the Fourth Middle School Project until June 7, 2002. On June 7, 2002, PHS terminated S&C from the Fourth Middle School Project. The termination letter identifies six areas where S&C failed to satisfy the terms of the electrical subcontract and concludes: " the work will be completed by Paul H. Schwendener, Inc. by whatever means necessary to fulfill the requirements of

6

the Subcontract Agreement and the project schedule." PHS notified Hartford of S&C's termination with a copy of the June 7, 2002, letter.

On June 10, 2002, Nu-Line began supplementing S&C's work on the Second High School Project. On June 15, 2002, PHS sent a handwritten fax to S&C terminating S&C from the Second High School Project. PHS did not send Hartford a copy of this faxed termination notice.

In a letter to PHS dated June 20, 2002, Hartford confirmed the receipt of a copy of the June 7, 2002, letter terminating S&C from the Fourth Middle School Project. In Hartford's letter to PHS, Hartford stated:

"Please note that although Hartford does not object to your decision of completing the work [on the Fourth Middle School Project], I refer you to Sections 3 and 4 of the Bond, which lists the Owner and Surety's obligations under the Bond.

I am sure you understand that Hartford must reserve its rights and defenses in connection with this matter."

Nu-Line and PHS entered into a subcontract dated June 21, 2002, for the Second High School Project. This subcontract was signed by Nu-Line on June 27, 2002, and by PHS on July 3, 2002. On June 24, 2002, PHS back charged S&C by deductive change order.

Also, on June 24, 2002, a telephone conference took place between Hartford's claim representative and counsel for PHS concerning both projects and S&C's termination from the Second High School Project. By letter dated June 25, 2002, counsel for PHS notified Hartford of S&C's termination from the Second High School Project and demanded Hartford's performance on the performance bond. On June 26, 2002, counsel for PHS sent a second letter to Hartford, demanding performance on the bonds for both the Second High School Project and the Fourth Middle School

7

Project.

On July 1, 2002, PHS submitted two sworn written applications and certificates for payment to the Plainfield School District requesting the school district pay PHS directly for "electrical management" of the Fourth Middle School Project and the Second High School Project. PHS's sworn applications stated the electrical work on each project was "100%" complete and the balance due S&C to be zero.

On July 18, 2002, PHS allowed qualified representatives of Hartford to inspect the school project sites to determine the status of both projects. The inspections disclosed the electrical work on both projects substantially completed at the time of the inspections.

On August 21, 2002, PHS requested Hartford's performance on the bonds, and repeated this request for performance on October 2, 2002. PHS again renewed the request on October 16, 2002, when PHS reported debt to Nu-Line of approximately $1,700,000, and demanded immediate payment of $500,000 from Hartford.

The litigation in this case began on July 16, 2002, when S&C filed a complaint in the circuit court of Will County against PHS, the school district, and PHS's bonding company, seeking payment for work performed and other relief. On October 22, 2002, PHS filed a counterclaim against S&C and a third-party complaint against Hartford. Hartford denied the allegations of PHS's third-party complaint.

On December 15, 2004, Hartford filed a motion for partial summary judgments seeking dismissal of counts V, X, XI, XII, XVII, XXII, XXIII, and XXIV, of PHS's fifth third-party complaint against Hartford, relating solely to the performance bond issues. In support of the motion for partial summary judgment, Hartford argued that PHS failed to meet the requirements of

8

paragraphs 3.2 and 3.3 of the performance bond, which negated Hartford's obligation to pay as surety on the Fourth Middle School Project. Hartford also claimed PHS "materially impaired" Hartford's rights by replacing S&C as the original electrical subcontractor without notice to Hartford as the surety. Hartford asserted the actions of PHS nullified the performance bond. Since S&C and Hartford shared the same rights and defenses relating to the performance bonds, the circuit court allowed S&C to join in Hartford's motion for partial summary judgment.

On February 7, 2006, the circuit court entered a written order, finding a question of material fact existed as to paragraph 3.1 of the performance bonds, which was not raised in Hartford's motion for partial summary judgment, and did not rule on that issue. However, the court did find that PHS failed to comply with the provisions of paragraph 3.2 and 3.3 of the performance bonds, and thereby nullified Hartford's right to investigate and act as set forth in paragraph 4 of the performance bonds. The circuit court reasoned:

> "In this case[,] a review of the documents, correspondence and contracts demonstrates that conditions 3.2 and 3.3 were not satisfied. In particular, PHS sent the notice of termination on June 7, 2002, while the contract that PHS entered into with Nuline [*sic.*] Electric for completion of S & C's work was signed on May 21, 2002. Thus, Hartford had no time to investigate and perform under the conditions of its bond.
>
> ***
>
> Because conditions precedent as set out in paragraphs 3.2 and 3.3 were not satisfied, Hartford is entitled to treat the bonds herein as null and void."

The circuit court further determined that a review of the pleadings, exhibits and arguments

9

failed to sustain PHS's arguments of waiver and estoppel against Hartford's assertion of PHS's failure to comply with the conditions precedent of the performance bonds. The circuit court therefore granted partial summary judgment in favor of Hartford. The circuit court further held: "With regard to S&C joining the motion, the court enters the same ruling, but only with regard to the surety bond issues."

The circuit court made an express finding pursuant to Supreme Court Rule 304(a) (210 Ill. 2d R. 304(a)), allowing an interlocutory appeal. PHS timely appealed. Additional facts will be discussed as necessary to an analysis of the issues.

II. ANALYSIS

The paramount issue in this appeal is whether the circuit court erroneously granted partial summary judgment in favor of Hartford and S&C. PHS challenges the circuit court's decision to grant partial summary judgment in favor of Hartford and S&C on several grounds. First, PHS argues the circuit court erroneously granted partial summary judgment because genuine issues of material fact exist between the parties. Second, PHS argues the electrical subcontracts granted PHS superior rights to complete the electrical work when PHS terminated S&C. Third, PHS denies the actions of PHS nullified Hartford's obligations under the performance bonds and contends that PHS substantially complied with paragraph 3 of the performance bonds. Fourth, PHS claims estoppel prevents Hartford's defenses. Fifth, PHS claims Hartford waived the right to mitigate damages under the terms of the performance bonds.

Summary judgment is proper when the pleadings, depositions and admissions, together with any affidavits on file, viewed in the light most favorable to the nonmoving party, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735

10

ILCS 5/2–1005(c) (West 2004); *Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186 (2002). The entry of summary judgment should only be employed when the right of the moving party is clear and free from doubt. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). We review a circuit court's summary judgment ruling *de novo*. *Delaney v. McDonald's Corp.*, 158 Ill. 2d 465, 467 (1994).

### A. Whether Genuine Issues of Material Fact Exist

We first address PHS's argument that the circuit court erroneously granted partial summary judgment because genuine issues of material fact exist between the parties. When the circuit court entered the written order, it found a question of material fact existed as to paragraph 3.1 of the performance bonds and did not rule on that issue, but granted partial summary judgment in favor of Hartford, finding PHS violated the terms of paragraphs 3.2 and 3.3 of the performance bonds. Therefore, we only review whether genuine issues of material fact exist with regard to the circuit court's ruling on paragraphs 3.2 and 3.3 of the performance bonds.

The parties do not dispute the material terms of the performance bonds or the S&C electrical subcontracts. However, PHS asserts that a comparison of the language of the performance bonds with the language of the S&C electrical subcontracts reveals conflicting methods for the completion of electrical work following S&C's termination. According to PHS, the S&C electrical subcontracts granted PHS superior authority to complete the projects with a replacement subcontractor. Thus, PHS contends, summary judgment was improper because the effect of the contracts on each other is disputed, creating a genuine issue of material fact.

We conclude the circuit court correctly viewed the relevant material facts as undisputed. The rights of PHS, S&C, and Hartford must be determined by construing the terms of the undisputed

11

contracts, thereby involving only a matter of law for the circuit court to decide. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 62-63 (2006). Consequently, we find no genuine issues of material fact to preclude the circuit court's consideration of whether Hartford and S&C were entitled to partial summary judgment as a matter of law.

B. Whether the S&C Subcontracts Granted PHS Superior Rights

PHS next argues the circuit court erred in granting partial summary judgment in favor of Hartford and S&C. Hartford relied on its rights under paragraphs 3, 4, and 5 of the performance bonds in seeking partial summary judgment. In contrast, PHS relied on its authority under section 2.c. of the S&C electrical subcontracts in opposing Hartford's motion for partial summary judgment.

On appeal PHS contends the performance bonds incorporated the S&C electrical subcontracts by reference. Thus, according to PHS, the terms of the S&C electrical subcontracts granted PHS the right to hire Nu-Line and superceded Hartford's right to select the replacement subcontractor under the performance bonds. Hartford responds by asserting the performance bonds allow only Hartford the right to mitigate damages and created the exclusive contractual authority for Hartford to determine the method of completing the electrical work on the projects.

Generally, when a performance bond incorporates the construction contract by reference, the provisions of the contract become the provisions of the bond, requiring the performance bond and the contract it secures to be read as one instrument. *Lake View Trust & Savings Bank v. Filmore Construction Co.*, 74 Ill. App. 3d 755, 757 (1979). However, the general rule fails in this case on two grounds due to the unique language of the contracts and the unique chronology of the events.

First, we address the unique language of the electrical subcontracts. Normally, courts construe the terms of a construction contract to become incorporated into the performance bond because the

bond and the construction contract mutually refer directly to each other. See *Lake View Trust &*
*Savings Bank*, 74 Ill. App. 3d at 757. This is not the situation in the case at bar. Section 12 of the
S&C electrical subcontracts deleted any requirement for S&C to obtain a performance bond at all.
PHS's declaration of its superior authority created by the electrical subcontract*s* over the performance
bonds, is misplaced.

Second, each performance bond is dated June 18, 2001, and contains a general reference to
the corresponding S&C electrical subcontract. However, each of the S&C electrical subcontracts is
dated June 21, 2001. Thus, the performance bonds predate the electrical subcontracts. Simply stated,
the June 18, 2001, performance bonds refer to nonexistent electrical subcontracts. Accordingly, PHS
cannot rely on the terms of the June 21, 2001, electrical subcontracts to extinguish Hartford's rights
under the performance bonds.

A savvy owner should not be allowed to eviscerate a surety's options and protections with
language selected later in a subsequent contract with another party. This is especially true when, as
here, the language of the subsequent contract has been argued to broaden the authority of PHS and
to diminish the right of Hartford to mitigate the damages. To decide this issue in any other way strips
Hartford of its protection, set forth in the performance bonds, which were the contracts reached first
in time in this case. We hold the surety's rights arising out of the performance bonds cannot be
diminished by the owner's authority under the terms of subcontracts that became effective after the
performance bonds. Accordingly, in this case, the terms of the performance bonds supercede the
terms of the S&C electrical subcontracts.

C. Whether the Actions of PHS Nullified the Performance Bonds

Having determined the terms of the performance bonds control the rights and obligations of Hartford and PHS for both the termination and the subsequent replacement of S&C with Nu-Line, we now consider whether PHS's actions nullified Hartford's obligations under the performance bonds. At issue, therefore, is the application of the terms of the performance bonds.

A performance bond is a contract, and contract principles apply in interpreting a performance bond. See *Mountbatten Surety Co. v. Szabo Contracting, Inc.*, 349 Ill. App. 3d 857, 868 (2004) (noting that "an indemnity agreement is a contract and is subject to the rules for interpreting contracts"). "Under general contract principles, a material breach of a contract provision by one party may be grounds for releasing the other party from his contractual obligations." *Mohanty*, 225 Ill. 2d at 70. A surety is not bound beyond the express terms of the performance bond and, when interpreting a performance bond, the court must look solely to the unambiguous language of the bond as evidence of the intentions of the parties. *Board of Local Improvements South Palos Township Sanitary District ex rel. North Side Tractor Sales Co. v. St. Paul Fire & Marine Insurance*, 39 Ill. App. 3d 255, 257-58 (1976).

We begin by reviewing the terms of the performance bonds. Paragraph 3 of each performance bond unambiguously sets forth three specific requirements for PHS to satisfy before terminating S&C as the electrical subcontractor from each project and triggering Hartford's obligations under the performance bonds. First, paragraph 3.1 required PHS to notify both S&C and Hartford of PHS's intent to declare a default and then attempt to arrange a conference between the parties. Compliance with paragraph 3.1 is not an issue in this appeal. Second, paragraph 3.2 required PHS to wait 20 days, after providing the notice of default, before terminating S&C. Third, paragraph 3.3 required PHS to

14

agree to pay the contract balance to either Hartford or a replacement subcontractor. Only after PHS satisfied each of these three conditions could PHS terminate S&C without adverse consequences to the benefit of the performance bonds.

If a proper declaration of default and subsequent termination takes place under paragraph 3 of the performance bonds, then paragraph 4 provides Hartford with only four options, including replacement, for completing the electrical work by: (1) arranging for completion with S&C, but only with the consent of PHS; (2) exercising Hartford's "right to perform" the work itself, without PHS's consent or approval required; (3) initiating and arranging for bids from new subcontractors approved by PHS, and then allowing the replacement subcontractor to sign a new contract with PHS, with limitations on the surety's risk; or (4) initiating an investigation to determine the amount of payment.

The structure of the performance bonds distinguished the act of termination from the act of replacement. Accordingly, these issues are treated in different paragraphs of the performance bonds, which specifically require that termination, as set forth in paragraph 3.2 of the bonds, must precede the option of replacement, as set forth in paragraph 4.3 of the same performance bonds. It is of vital importance to recognize that termination is a right available only to PHS under paragraph 3 of the bonds. Similarly, replacement is a form of mitigation available only to Hartford under the provisions of paragraph 4. The performance bonds balance the rights of both owner and surety.

After clarifying the terms of the performance bonds, as well as the parties' corresponding rights and responsibilities, we now consider whether PHS substantially complied with the performance bonds or whether PHS's actions nullified the performance bonds. We address each school project separately.

1. Fourth Middle School Project

15

The circuit court determined, as a matter of law, that PHS failed to satisfy paragraphs 3.2 and 3.3 of the performance bond and that PHS's actions caused the terms of the performance bond to be "null and void." PHS argues that the circuit court erred in granting partial summary judgment in favor of Hartford and S&C on the Fourth Middle School Project because PHS substantially complied with these paragraphs of the performance bond. Therefore, we must consider whether PHS complied with paragraph 3 of the performance bond with regard to the Fourth Middle School Project.

To reiterate, we have previously determined that the terms of the performance bond controls the rights and obligations of Hartford and PHS regarding termination and replacement of S&C. The performance bond requires a specific sequence of conditions must take place before Hartford is required to exercise one of its options set forth in paragraph 4 of the bond, which include the replacement of S&C. Importantly, termination as outlined in paragraph 3.2 must take place before Hartford may be expected to initiate the process of replacement as allowed in paragraph 4.3 of the performance bond.

We examine the history of the Fourth Middle School Project and the written correspondence of the parties to determine if PHS acted to terminate S&C before the replacement of S&C occurred. Over the course of construction on the Fourth Middle School Project, PHS had escalating concerns with the timeliness of S&C's electrical work. On March 20, 2002, PHS notified Hartford that PHS was considering declaring S&C in default as required by paragraph 3.1 of the performance bond.

On March 25, 2002, PHS sent a second letter to S&C, requesting S&C to correct its work deficiencies, within the following week, to "avoid termination from the project." The letter does not indicate a copy was sent to Hartford. Following the March correspondence, PHS waited approximately 20 days before retaining Nu-Line as a consultant on April 12, 2002, while allowing

16

S&C to stay on the project. On May 9, 2002, Nu-line began to supplement S&C's sluggish electrical construction but S&C remained the principal electrical subcontractor. On May 21, 2002, PHS redefined Nu-Line's duties and signed a subcontract with Nu-Line for the completion of electrical work previously the subject of S&C's subcontract. By letter dated June 7, 2002, PHS terminated S&C from the Fourth Middle School Project. Hartford received a copy of the termination letter which stated, in part, "the work will be completed by Paul H. Schwendener, Inc. by whatever means necessary to fulfill the requirements of the Subcontract Agreement and the project schedule."

Examining the issues related to paragraph 3.2 only, we note S&C's termination from the Fourth Middle School Project took place on June 7, 2002, but replacement took place on May 21, 2002, with the execution of the Nu-Line subcontract. The trial court's ruling recognized termination must take place first in time before replacement. As to the Fourth Middle School Project, we agree with the trial court that the replacement of S&C occurred before termination. Technically, we disagree that this was a violation of paragraph 3.2 of the performance bond, but we agree with the trial court's finding that PHS's decision to replace S&C before terminating S&C violated paragraph 4 of the performance bond, which nullified Hartford's duty to act.

The trial court's order granting partial summary judgment also addressed the parties' arguments regarding paragraph 3.3 of the performance bond for the Fourth Middle School Project. Necessarily, we also continue our analysis of the trial court's order by examining whether PHS met the requirements of paragraph 3.3 of the performance bond. Paragraph 3.3 of the performance bond required PHS to agree to pay the surety the contract price or agree to pay the replacement contractor that has been selected, subject to the restrictions of the performance bond itself. Significantly, PHS admits it did not agree to pay Hartford the balance of the subcontract as required by paragraph 3.3

17

of the performance bond. PHS contends it was not obligated to make this offer because Hartford did not specifically request PHS to pay Hartford the balance due on the subcontract.

We reject PHS's argument based on a plain reading of the performance bond. Paragraph 3.3 of the performance bond clearly places the affirmative duty on PHS to agree to pay the contract balance without any initial request from Hartford. PHS did not agree to pay and, therefore, PHS failed to comply with the terms of paragraph 3.3 of the performance bond.

Next, we review the trial court's determination that PHS's actions caused the terms of the performance bond to be "null and void." For an understanding of the trial court's ruling, it is necessary to discuss *Dragon Construction, Inc. v. Parkway Bank & Trust,* 287 Ill. App. 3d 29 (1997), as it applies to the timing of the events with the replacement subcontractor, Nu-Line, in this case. Noting the sequence of events, which demonstrate PHS replaced S&C before PHS terminated S&C, Hartford directs our attention to *Dragon* in support of its argument that PHS's actions compromised Hartford's ability, as surety, to mitigate its damages as contemplated by the performance bond rendering the agreement null and void.

In *Dragon*, the property owners hired a contractor to build a hardware store for them. The performance bond incorporated the terms of the construction contract, which required seven days' written notice to both the contractor and the surety before the property owners could terminate the contractor from the project. Due to slow progress, the owners in *Dragon* terminated the contractor and hired a replacement contractor on the same day. The owners then immediately notified the surety that the original contractor had been both terminated and replaced.

Consequently, the surety did not receive the required seven days' written notice of the termination before the replacement contractor was hired. Additionally, the owners in *Dragon* hired

18

the replacement contractor without taking competitive bids as required by the surety bond.

The appellate court in *Dragon,* affirmed the circuit court's order, which found the owners' conduct rendered the surety bond null and void and granted summary judgment in favor of the surety. The court in *Dragon* reasoned:

> "We find the [owners'] failure to provide adequate notice of Dragon's termination and their hiring of a successor contractor before [the surety] received the late notice stripped [the surety] of its right to limit its liability and constituted a material breach of contract which rendered the surety bonds null and void." *Dragon Construction, Inc.,* 287 Ill. App. 3d at 34.

*Dragon* is not directly on point with the case at bar, since paragraph 3.2 of the S&C performance bond does not require any notice to the surety regarding PHS's decision to declare a default and terminate S&C. The bond requires PHS provide only a notice of intent to default under paragraph 3.1 of the bond and then wait 20 days as required by paragraph 3.2 of the bond.

However, there are other similarities that cause the analysis in *Dragon* to be persuasive. In this case, the conduct of PHS acted to strip Hartford of its rights, just as the actions of the contractor in Dragon stripped the surety of its options, to mitigate. PHS's decision to hire Nu-Line before declaring S&C in default and terminating S&C from the project extinguished the options available to Hartford under paragraphs 4.1, 4.2, and 4.3 of the performance bond, effectively forcing Hartford to forgo these options. The only option that survived PHS's decision to terminate S&C was Hartford's option to investigate and then agree to pay or deny payment as set forth in paragraph 4.4 of the performance bond.

PHS arranged, undertook to perform, and negotiated the contract with the replacement

19

subcontractor, Nu-Line, in violation of paragraphs 4.1, 4.2, and 4.3 of the performance bond. Nonetheless, Hartford, in good faith, explored the possibility of waiving its right to mitigate damages by undertaking an investigation as allowed by subparagraph 4.4. However, Hartford's inspection of the Fourth Middle School Project on July 18, 2002, was of limited value since the electrical work was substantially completed at that time, and it was difficult to determine what work Nu-Line completed after June 7, 2002, as the replacement contractor.

We conclude, as to the Fourth Middle School Project, that PHS violated paragraph 3.3 of the performance bond by failing to agree to pay Hartford the balance of the subcontract. Additionally, we conclude PHS exceeded its authority under the performance bond by hiring Nu-Line first and thereafter declaring a subcontractor default and termination, which negated Hartford's options under paragraphs 4.1, 4.2, and 4.3 of the performance bond. This course of conduct violated the terms of the performance bond and nullified Hartford's duty to perform. The circuit court, therefore, properly granted partial summary judgment in favor of Hartford and S&C on the Fourth Middle School Project.

## 2. The Second High School Project

We now consider whether PHS substantially complied with the performance bond on the Second High School Project or whether its actions nullified the performance bond. Similar to the Fourth Middle School Project, over the course of time, PHS grew increasingly dissatisfied with the timeliness of S&C's work on the Second High School Project. In a letter dated March 20, 2002, PHS expressed its complaints regarding S&C's electrical work on the Second High School Project. PHS sent Hartford a copy of the letter, which also made reference to paragraph 3.1 of the performance bond. More than 20 days after the March correspondence, PHS faxed a handwritten termination

notice to S&C on June 15, 2002. There is no indication PHS sent a copy of the termination notice to Hartford.

The trial judge rendered a carefully written order resolving the issues raised in the motion for partial summary judgment, but the order includes a minor misunderstanding that June 7, 2002, was the date PHS terminated S&C from both projects. It is undisputed that S&C received the notice of its termination from the Second High School Project no earlier than June 15, 2002.

On June 21, 2002, PHS hired Nu-Line to complete the Second High School Project without consulting Hartford or providing Hartford with notice that PHS terminated S&C. The Nu-Line replacement subcontract for the Second High School Project was dated June 21, 2001. Therefore, PHS did not replace S&C before it sent the termination notice to S&C on June 15, 2002. However, PHS did not notify Hartford of S&C's termination until June 24, 2002.

The next day, PHS demanded performance by Hartford on June 25, 2002, for the Second High School Project. Again, on June 26, 2002, PHS made a second written demand for Hartford's performance on the Second High School Project performance bond and made the first written demand for performance on the Fourth Middle School Project performance bond.

As the trial court correctly noted, "Hartford had no time to investigate and perform under the conditions of its bond." PHS's demand for performance under the Second High School Project performance bond did not afford Hartford any time to act with reasonable promptness to investigate its options set forth in paragraph 4 of the performance bond and then decide its course of conduct to either complete the project or pay the damages. We conclude PHS improperly demanded performance of Hartford under the performance bond nearly contemporaneously with the notice of termination of S&C on the Second High School Project.

The issue of nullification on the Second High School Project as it relates to paragraph 3.2 of the performance bond is more complex due to the sequence of events. Regarding the Second High School Project, we note the faxed June 15, 2002, notice of termination was PHS's only attempt to comply with paragraph 3.2 of the performance bond. The record shows PHS hired Nu-Line as the replacement subcontractor for the Second High School Project on June 21, 2002, six days after the faxed notice of termination to S&C. However, PHS notified Hartford of the termination of S&C on June 24, 2002. Unlike the Fourth Middle School Project, the June 15, 2002, notice of termination did properly precede the June 21, 2002, replacement contract with Nu-Line on the Second High School Project. Therefore, we disagree that the timing of the termination and replacement violated the interlaced requirements of paragraphs 3 and 4 of the performance bond and did not independently nullify the obligations of Hartford to perform on the Second High School Project.

Additionally, in the written order granting partial summary judgment, the trial court specifically found the conditions of "[paragraph] 3.3 were not satisfied." Although PHS disputes the circuit court's findings, PHS admits it did not agree to pay Hartford the balance of the subcontract but, again, PHS contends it was not obligated to make this offer.

We have rejected PHS's argument based on a plain reading of paragraph 3.3 of the performance bond, which clearly places the affirmative duty on PHS to agree to pay the contract balance without any initial request from Hartford. PHS did not agree to pay and, therefore, PHS violated paragraph 3.3 of the performance bond with regard to the Second High School Project. Since we have determined PHS exceeded its contractual authority under the controlling language of the performance bond by hiring Nu-Line, as the replacement electrical subcontractor, on both projects, we also conclude any purported agreement to pay Nu-Line was ineffective as to the

22

requirements of paragraph 3.3 of the performance bond.

We conclude, as to the Second High School Project, that PHS violated the terms of paragraph 3.3 of the performance bond by not agreeing to pay the contract balance to Hartford, which negated Hartford's duty to act under the terms of the performance bond. We also conclude PHS denied Hartford a reasonable time under the performance bond to exercise Hartford's options under paragraph 4 of the performance bond, rendering the agreement null and void. The circuit court, therefore, properly granted partial summary judgment in favor of Hartford and S&C on the Second High School Project.

### D. Equitable Estoppel

PHS argues Hartford should be estopped from contesting Nu-Line as replacement subcontractor, because Hartford failed to object to Nu-Line's "supplementing" S&C's electrical work. The circuit court rejected PHS's estoppel argument.

The doctrine of equitable estoppel may be invoked by a court to prevent fraud or injustice. *Byron Community Unit School District No. 226 v. Dunham-Bush, Inc.*, 215 Ill. App. 3d 343, 348 (1991). "Estoppel arises when a party, by his word or conduct, *** induces reasonable reliance by another on his representations and thus leads the other, as a result of that reliance, to change his position." *Byron Community Unit School District No. 226*, 215 Ill. App. 3d at 348.

Even after Hartford determined S&C would complete the electrical construction on the school projects in a timely manner, PHS contracted with Nu-Line to provide supplemental work. The performance bonds did not prohibit PHS from hiring additional electrical subcontractors to supplement S&C's work and assist S&C to finish the projects in a timely fashion. Consequently, we do not believe Hartford could have effectively objected to the supplemental work by Nu-Line. The

23

supplemental work was a matter between S&C and PHS, not Hartford and PHS.

PHS argues that Hartford did "not object to [PHS's] decision of completing the work," and therefore, Hartford is estopped from using the replacement of S&C as a basis to deny coverage under the performance bonds. We reject this argument.

*Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313 (2001), set forth the elements for establishing equitable estoppel:

> "To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." *Geddes*, 196 Ill. 2d at 313-14, citing *Vaughn v. Speaker*, 126 Ill. 2d 150, 162-63 (1988).

Estoppel requires reliance and a change of position by one party. *Byron Community Unit School District No. 226*, 215 Ill. App. 3d at 348. Significantly, PHS must show that its reasonable reliance on Hartford's letter of June 20, 2002, caused PHS to change its position regarding S&C. Specifically, Hartford's letter of June 20, 2002, stated:

> "Please note that although Hartford does not object to your decision of

completing the work [on the Fourth Middle School Project], I refer you to Sections 3 and 4 of the Bond, which lists the Owner and Surety's obligations under the Bond.

I am sure you understand that Hartford must reserve its rights and defenses in connection with this matter."

The facts of this case demonstrate PHS did not rely on Hartford's "does not object" language. With regard to the Fourth Middle School Project, it is undisputed that Hartford made this written statement on June 20, 2002, long after PHS replaced S&C with Nu-Line on May 21, 2002. As to the Second High School Project, PHS notified S&C of its termination in the June 15, 2002, handwritten fax. This fax was dispatched before the June 20, 2002, letter from Hartford, which contained the "does not object" language that PHS relies on to claim estoppel. In either situation, PHS did not change its position after Hartford's June 20, 2002, letter because PHS terminated S&C long before receiving the letter. Simply stated, PHS cannot show reliance on Hartford's statement.

Ironically, we find PHS adopted a course of conduct that deliberately caused Hartford to believe PHS did not object to the performance bonds controlling PHS's conduct on the issue of replacement of the electrical subcontractor. To demonstrate the irony in PHS's estoppel argument, we examine the conduct of PHS. Pursuant to paragraph 3.1 of the performance bond, PHS provided both S&C and Hartford with notice of S&C's default in a letter dated March 20, 2002. Pursuant to paragraph 3.2 of the performance bond, PHS honored the 20-day waiting period and attempted to set up a conference between the parties as required by the performance bond. During the 20-day waiting period, PHS allowed Hartford to attempt to resolve the difficulties with S&C as provided by the performance bond. Additionally, PHS did not object when Hartford arranged with S&C to

25

complete the electrical work. PHS participated in this process by cooperatively interacting with Hartford during the 20-day waiting period, which would have expired on or about April 11, 2002. Then, on April 12, 2002, without contacting Hartford, PHS hired Nu-Line, purportedly only to act as a consultant to PHS.

On May 6, 2002, Hartford advised PHS that S&C would be completing the electrical work for the Fourth Middle School Project. Accordingly, PHS appeared to accept Hartford's decision to allow S&C to complete the project and PHS wrote a letter to S&C on May 9, 2002. In this letter PHS did not object to S&C staying on the project. In fact, PHS reminded S&C it would be required to meet the April 22 schedule and sent a copy of the letter dated May 9 to Hartford. Importantly, on May 14, 2002, PHS specifically informed S&C that PHS "wish[ed] to finish this project successfully with your company."

PHS's actions caused both Hartford and S&C to continue to believe S&C would be completing the contract and that Nu-line was only acting to supplement certain areas of work. Even after May 21, 2002, the date PHS hired Nu-Line to complete the Fourth Middle School Project, PHS continued to allow S&C to perform electrical work to complete the Fourth Middle School Project, and secretively failed to disclose that Nu-Line was acting to *complete* the project. PHS unfairly delayed the notice of replacement by waiting until June 7, 2002, to advise either Hartford or S&C of the replacement and termination of S&C from the Fourth Middle School Project and June 24, 2002, on the High School Project.

This course of conduct shows PHS understood and attempted to negate Hartford's exclusive right to choose the replacement contractor. This delayed notification is fatal to PHS's request for

payment under the performance bond. PHS effectively extinguished three of Hartford's options to mitigate damages as set forth in paragraphs 4.1, 4.2, and 4.3 of the performance bonds. Accordingly, we reject PHS's equitable estoppel argument.

## E. Waiver

Finally, PHS claims Hartford waived its right to mitigate damages under the terms of the performance bonds. PHS argues that Hartford waived its objection to the selection of Nu-Line by Hartford's course of conduct and the letter dated June 20, 2002. The circuit court also rejected this argument. Since the June 20, 2002, letter from Hartford related only to the Fourth Middle School Project, we confine our waiver analysis to this project.

"Waiver is an express or implied voluntary and intentional relinquishment of a known and existing right." *Batterman v. Consumers Illinois Water Co.*, 261 Ill. App. 3d 319, 321 (1994), citing *Geier v. Hamer Enterprises, Inc.*, 226 Ill. App. 3d 372 (1992). Parties may waive contractual provisions and waiver may be established by conduct indicating that strict compliance with contractual provisions will not be required. *Batterman*, 261 Ill. App. 3d at 321, citing *Whalen v. K Mart Corp.*, 166 Ill. App. 3d 339 (1988). "An implied waiver may arise from either of two situations: (1) an unexpressed intention to waive can be clearly inferred from the circumstances; or (2) the conduct of one party has misled the other party into a reasonable belief that a waiver has occurred." *Batterman*, 261 Ill. App. 3d at 321.

Whether PHS presented sufficient facts establishing Hartford waived any objection to the replacement of S&C becomes a question of law. *Batterman*, 261 Ill. App. 3d at 321. When the issue is purely a question of law, the applicable standard of review is *de novo*. *People v. Chapman*, 194 Ill.

27

2d 186, 217 (2000) (stating that *de novo* review is appropriate when there are no factual or credibility disputes and the appeal, therefore, "involves a pure question of law").

Although waiver may be implied under some circumstances, the actions constituting the waiver must be clear, unequivocal and decisive. *Galesburg Clinic Ass'n v. West*, 302 Ill. App. 3d, 1016, 1019-20 (1999). Waiver must be based on the conduct of the party impliedly waiving a contract. *Batterman*, 261 Ill. App. 3d at 321, citing *Lavelle v. Dominick's Finer Foods, Inc.*, 227 Ill. App. 3d 764, 771 (1992).

Again, Hartford's letter to PHS, with regard to the Fourth Middle School Project, stated:

> "Please note that although Hartford does not object to your decision of completing the work [on the Fourth Middle School Project], I refer you to Sections 3 and 4 of the Bond, which lists the Owner and Surety's obligations under the Bond.
>
> I am sure you understand that Hartford must reserve its rights and defenses in connection with this matter."

The parties confuse PHS's required three-day notice to cure inadequate work under the S&C electrical subcontract with PHS's requirement to express its intent to declare a default under paragraph 3.1 of the performance bond. The March 20, 2002, letter from PHS to S&C refers to both the three-day notice to cure under 2.c. of the S&C electrical subcontract and the very different 20-day notice of intent to default under paragraph 3.1 of the performance bond. These notices arise out of separate contracts and are not one and the same.

The June 20, 2002, letter shows that Hartford understood section 2.c. of the S&C electrical subcontract allowed PHS to correct work if S&C failed to comply with the three-day notice by curing and properly executing the work. However, the completion of work does not necessarily mean that

28

PHS could unilaterally replace S&C without severe consequences to the performance bond. As previously stated, the performance bond controlled the relationship of Hartford and PHS, not the electrical subcontract.

The June 20, 2002, letter also clearly demonstrates that Hartford insisted and even reminded PHS that Hartford had superior rights to determine the method of completion of the electrical subcontract under paragraphs 3 and 4 of the performance bond. The letter reveals a clearly expressed intent on the part of Hartford to "reserve" and not to waive its rights under paragraphs 3 and 4 of the performance bond on the Fourth Middle School Project.

Contrary to PHS's argument regarding waiver, the fact that Hartford stated it did "not object" to PHS completing the electrical work on the Fourth Middle School Project became irrelevant due to PHS's course of conduct. The timing of the contract between PHS and Nu-Line on May 21, 2002, is important to an understanding of this issue. When PHS terminated S&C on June 7, 2002, as to the Fourth Middle School Project, PHS had already contracted with Nu-Line as the replacement subcontractor on May 21, 2002. You cannot waive what you do not have and Hartford did not have the option of rejecting Nu-Line, because Nu-Line became PHS's replacement subcontractor on the Fourth Middle School Project effective May 21, 2002. We conclude Hartford did not waive the requirements of paragraph 3 of the performance bond.

## III. CONCLUSION

For the foregoing reasons, we conclude the circuit court properly granted partial summary judgment in favor of Hartford and S&C. We therefore affirm the judgment of the circuit court of Will County and remand for further proceedings.

Affirmed and remanded.

McDADE and SCHMIDT, JJ., concurring.