# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 09-2182

SAUL H. CATALAN and MIA MORRIS,

*Plaintiffs-Appellants,*

*v.*

GMAC MORTGAGE CORP.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 6920—**George W. Lindberg**, *Judge.*

ARGUED FEBRUARY 12, 2010—DECIDED JANUARY 10, 2011

Before EASTERBROOK, *Chief Judge*, HAMILTON, *Circuit Judge*, and SPRINGMANN, *District Judge.**

HAMILTON, *Circuit Judge.* Plaintiffs Saul H. Catalan and Mia Morris sued defendants RBC Mortgage Company and GMAC Mortgage Company under the federal Real

---

* Hon. Theresa L. Springmann of the Northern District of Indiana, sitting by designation.

Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.*, and under Illinois law for gross negligence, breach of contract, and willful and wanton negligence. The district court dismissed the plaintiffs' gross negligence claim as merely duplicating the willful and wanton negligence claim. The court granted summary judgment to GMAC Mortgage on the plaintiffs' RESPA, breach of contract, and remaining negligence claims. The plaintiffs appeal those decisions. We reverse the grant of summary judgment for GMAC Mortgage on the plaintiffs' RESPA and breach of contract claims, and we affirm summary judgment on their negligence claims.[1]

I. *The Real Estate Settlement Practices Act*

Before digging into the details of plaintiffs' maddening troubles with their mortgage, we provide a sketch of the relevant RESPA requirements. RESPA is a consumer protection statute that regulates the real estate settlement process, including servicing of loans and assignment of those loans. See 12 U.S.C. § 2601 (Congressional findings). The statute imposes a number of duties on lenders and loan servicers. Most relevant here are the requirements that borrowers be given notice by both

---

[1] Plaintiffs' claims against RBC proceeded to trial. The jury found in favor of the plaintiffs on their RESPA and negligence claims, awarding them $1,100 and $10,000 for those claims, respectively. The jury found for RBC on the plaintiffs' breach of contract claim. The plaintiffs' claims against RBC are not part of this appeal, and RBC is no longer a party.

transferor and transferee when their loan is transferred to a new lender or servicer, 12 U.S.C. §§ 2605(b) and (c), and that loan servicers respond promptly to borrowers' written requests for information, § 2605(e).

The details of the requirement for responding to written requests will become relevant here. First, it takes a "qualified written request" to trigger the loan servicer's duties under RESPA to acknowledge and respond. The statute defines a qualified written request as written correspondence (other than notices on a payment coupon or similar documents) from the borrower or her agent that requests information or states reasons for the borrower's belief that the account is in error. 12 U.S.C. § 2605(e)(1)(B). To qualify, the written request must also include the name and account of the borrower or must enable the servicer to identify them. *Id.*

Within 60 days after receiving a qualified written request, the servicer must take one of three actions: either (1) make appropriate corrections to the borrower's account and notify the borrower in writing of the corrections; (2) investigate the borrower's account and provide the borrower with a written clarification as to why the servicer believes the borrower's account to be correct; or (3) investigate the borrower's account and either provide the requested information or provide an explanation as to why the requested information is unavailable. See 12 U.S.C. §§ 2605(e)(2)(A), (B), and (C). No matter which action the servicer takes, the servicer must provide a name and telephone number of a representative of the servicer who can assist the borrower.

See *id*. During the 60-day period after a servicer receives a qualified written request relating to a dispute regarding the borrower's payments, "a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency." 12 U.S.C. § 2605(e)(3).

RESPA provides for a private right of action for violations of its requirements. 12 U.S.C. § 2605(f). The provision for a private right of action includes a "safe harbor" provision, which provides in relevant part that a transferee service provider like GMAC Mortgage shall not be liable for a violation of section 2605 if, "within 60 days after discovering an error (whether pursuant to a final written examination report or the servicer's own procedures) and before the commencement of an action under this subsection and the receipt of written notice of the error from the borrower, the servicer notifies the person concerned of the error and makes whatever adjustments are necessary in the appropriate account to ensure that the person will not be required to pay an amount in excess of any amount that the person otherwise would have paid." 12 U.S.C. § 2605(f)(4).

II.  *The Facts*

Because the plaintiffs appeal the district court's grant of summary judgment, we review the trial court's decision *de novo*, viewing all evidence in the light most favorable to and drawing all reasonable inferences for the plaintiffs, as the non-moving parties. See Fed. R. Civ. P.

56(c); *Hukic v. Aurora Loan Services*, 588 F.3d 420, 432 (7th Cir. 2009); *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). We trace the plaintiffs' problems with their original mortgage servicer, then with the transfer of the mortgage to GMAC Mortgage, as relevant to plaintiffs' claims that GMAC Mortgage violated RESPA by failing to provide notice of the transfer and by failing to respond to their qualified written requests, and by failing to correct erroneous information it had given to credit-reporting services.

*Plaintiffs' Problems with RBC Mortgage*: In June 2003, the plaintiffs bought a home in Matteson, Illinois. They obtained a Federal Housing Administration loan by executing a mortgage and note in favor of RBC. At the outset, theirs was a 30-year fixed loan at 5.5% annual interest with a monthly payment of $1,598 that included principal, interest, and escrow.

Although the plaintiffs' first payment was not due until August 1, 2003, RBC incorrectly entered the plaintiffs' mortgage into its computer accounting system to show a first payment due date of July 1, 2003. Because of this error, when the plaintiffs made their first payment they were already behind—at least according to RBC's system. By the time the plaintiffs made their second payment, RBC had determined that their loan was in default, and it increased their monthly payment amount to $1,787. The plaintiffs, at first unaware of the increase, and then, without receiving an explanation of the increase, continued to send their mortgage payments for the original amount. RBC returned those checks uncashed.

RBC filed for foreclosure on the plaintiffs' home on February 26, 2004. In May and June, the plaintiffs provided checks to RBC in an attempt to make up for the uncashed payments. However, the plaintiffs' May 2004 payment was still due even after this reconciliation of their account. RBC did not provide the plaintiffs with an account statement or otherwise inform them of that delinquency. Then, when the plaintiffs sent their August 2004 payment to RBC, RBC did not apply that payment to the loan.

*GMAC Mortgage Steps In*: In September 2004, RBC assigned the plaintiffs' loan to GMAC Mortgage. When GMAC Mortgage assumed the plaintiffs' mortgage, it did not send the plaintiffs a letter notifying them of the transfer. Plaintiffs, not knowing that GMAC Mortgage was their new mortgage holder, sent their September payment to RBC. RBC did not cash it but forwarded it to GMAC Mortgage.

At some point in this period, GMAC Mortgage sent the plaintiffs an account statement dated September 15, 2004, which they received. That account statement was based on information that GMAC Mortgage had received from RBC. It showed that the plaintiffs' account was past due in the amount of $7,990 and that GMAC Mortgage had already assessed late fees totaling $255. On September 23, 2004, GMAC Mortgage sent the plaintiffs a letter demanding proof of their homeowners' insurance coverage. Then, on September 27th, GMAC Mortgage returned the plaintiffs' September payment, which they had sent to RBC. The letter returning the

payment informed the plaintiffs that the payment represented only one of five payments that were then due (from May to September), and provided the plaintiffs with a phone number.

On October 6, 2004, the plaintiffs wrote to the United States Department of Housing and Urban Development ("HUD") detailing what they understandably described as their "nightmare" with RBC. They explained:

> Despite admissions by RBC that they made errors, they feel no obligation to correct the grievance [sic] wrongs by supplying information necessary to bring closure to this situation, and they have cashed checks as if there was never any question raised or breach of obligation on their part. This is the same company that as of a few weeks ago was in hot pursuit of our home by means of foreclosure and had for months refused to accept our payments. The last message we received from RBC stated that there were updates on our account yet they have continually refused to operate in a professional manner by providing a written explanation that would offer us clarity and accountability on their part.

The letter provided a detailed outline of the plaintiffs' account history with RBC, including the fact that their first payment had been due in August 2003. It also recounted that RBC did not cash their August or September 2004 payments, and that on October 4th they received a letter from GMAC Mortgage returning their September 2004 payment and informing them that the payment was not enough to cover the past due balance

because five payments were then due. The plaintiffs wrote: "GMAC claims that they took over our mortgage in May 04. No information to that effect had ever previously been provided by RBC or GMAC." Finally, their letter asked several questions about RBC's and GMAC Mortgage's servicing practices, among them:

- Why did [RBC] cash checks in July for an account that they did not hold and according to GMAC had purportedly been sold in May?

- What happened to the funds that were taken in July?

- Why were previous checks not forwarded to the new company?

- Why would GMAC just now initiate contact?

- Why would GMAC purchase a "nonperforming" mortgage?

The plaintiffs sent their letter to HUD, which forwarded it to GMAC Mortgage, which received it on October 14, 2004.

In the meantime, on October 7th and again on October 15th, the plaintiffs wrote to GMAC Mortgage directly, requesting information concerning the transfer of their loan, including the date of the transfer, the amount transferred, confirmation of their monthly payment amount, and the payment address. The October 15th letter further sought "any information available about this account."

On October 13th, in response to the plaintiffs' October 7th letter, GMAC Mortgage advised the plaintiffs that

their account had been transferred on September 1, 2004 and that a monthly payment of $1,661 had been due on May 1st. The response also listed plaintiffs' then-current principal balance. Then, under separate cover, when GMAC Mortgage did not receive the plaintiffs' October 2004 payment, the company demanded $9,588 for payments on the plaintiffs' account since May 2004, plus $255 in late fees. In that letter dated October 15, 2004, GMAC Mortgage informed the plaintiffs that they were in default and stated that they could cure by paying the total amount due within 30 days. Days later on October 20th, GMAC sent an odd letter informing plaintiffs that their monthly payment was $1,598, their "next payment due date" was May 1, 2004, and that there was an escrow shortage in their account of $7,022.

On October 21, 2004, GMAC Mortgage responded to the letter that it had received from HUD in a letter to HUD captioned "Re: Saul Catalan and Mia Morris . . . Payment Dispute." GMAC Mortgage informed HUD that there was no indication that the plaintiffs' funds were missing or misapplied based on the records that GMAC Mortgage had received from RBC. GMAC Mortgage also told HUD that those records reflected that the plaintiffs' first payment had been due in July 2003.

GMAC Mortgage sent a letter to the plaintiffs on October 25, 2004 to advise them that their mortgage had "reached an advanced stage of delinquency" and to offer alternatives, such as a repayment plan, loan modification, or deed in lieu of foreclosure, to avoid a completed foreclosure.

On November 15, 2004, the plaintiffs sent a letter to GMAC Mortgage, describing their history with RBC and enclosing a check for $11,186 to cover seven payments of $1,598. In that letter they informed GMAC Mortgage that "RBC received payments from us that were not applied promptly, other payments that were never applied and they never provided a clear explanation for their refusal to accept our payments, an action which resulted in our home being wrongfully placed in foreclosure." They also set forth their "expectations" for how their account would be handled, advising GMAC Mortgage that they expected that "any request from us for information will be provided," "any changes to our account or information that requires correspondence will be forwarded to us in writing," and "all payments will be processed in a timely manner." Finally, they advised GMAC Mortgage that "if you have any questions regarding this account I would appreciate them being asked in writing from the standpoint that documentation is clarity. It is an unsafe approach to take the word of RBC as fact because as a company they have proven to me that fact for them is evasive."[2] On November 24, 2004, GMAC Mortgage commenced foreclosure proceedings. By December 2004, GMAC Mortgage

---

[2] GMAC Mortgage suggests that the plaintiffs' insistence on communication in writing equates to a failure to cooperate or to communicate with GMAC Mortgage. Given the history of the debacle, plaintiffs' insistence seems at least reasonably prudent and should not be faulted. As will be seen, the plaintiffs' insistence likely saved their claims under RESPA.

was reporting the plaintiffs' loan as delinquent to the credit bureaus.

On December 2, 2004, the plaintiffs sent GMAC Mortgage another letter to request that GMAC Mortgage apply the $11,186 payment to their account, explaining that "it becomes a major disruption to have large sums of money unaccounted for." They wrote again on December 9th, again asking GMAC Mortgage to process the $11,186 check and requesting "quick resolution of whatever issues remain since the transfer of this account to your company by processing and updating this and all future payments received immediately." The plaintiffs sent their December mortgage payment on the same date under separate cover. On December 13th, GMAC Mortgage returned the $11,186 check, explaining that the funds did not represent the full amount required to bring the plaintiffs' account current and advising the plaintiffs that their account had been sent to an attorney to begin foreclosure proceedings. It then responded to the plaintiffs' December 2nd and 9th letters on December 23rd and 30th. In each of those letters, it stated, "thank you for your inquiry on your account. We are currently processing your request and will respond in writing within 20 days." The record does not contain these promised follow-up responses.

The plaintiffs then wrote GMAC Mortgage's outside foreclosure counsel a letter dated December 17th stating that they disputed GMAC Mortgage's attempt to collect on their account and that they had sent everything necessary to bring their account current. They also requested

an explanation for why, according to the letter they had received from foreclosure counsel, the balance of their account had been increased by $19,200 between September and November 2004. That same day (and 23 days after it had filed for foreclosure), GMAC Mortgage dismissed the foreclosure proceedings. Then, inexplicably, on December 22nd, GMAC Mortgage sent another letter to the plaintiffs advising them that their account had been transferred to GMAC Mortgage's attorney for foreclosure proceedings and returning their December 2004 payment!

On January 25, 2005, HUD again intervened, requesting that, upon receipt of ten mortgage payments from the plaintiffs (for the months of May 2004 to February 2005), GMAC Mortgage reinstate the plaintiffs' loan as current and waive any and all extra charges and attorney fees. The plaintiffs sent a check for $15,980 to GMAC Mortgage on February 3, 2005. That amount represented ten mortgage payments and included no account fees or costs, and thus amounted to what the plaintiffs would have otherwise paid in regular mortgage payments over ten months. Once it had received the plaintiffs' check, GMAC Mortgage brought their account current without charging them penalties or additional interest.

In April 2005, HUD contacted GMAC Mortgage on the plaintiffs' behalf to request that GMAC Mortgage stop reporting them as delinquent to the credit bureaus. On May 4, 2005, GMAC Mortgage complied, and in August 2005 it sent the plaintiffs a letter claiming that its records indicated that it had not reported any deroga-

tory credit information on the plaintiffs' account from September 2004 through July 2005.

*The District Court Proceedings*: GMAC Mortgage moved for summary judgment on all of the plaintiffs' claims. Without reaching the merits of the plaintiffs' RESPA claims, the court found that GMAC Mortgage qualified for RESPA's safe harbor provision and was therefore not liable for any violations under that statute. The court dismissed the plaintiffs' gross negligence claim, finding that it duplicated the plaintiffs' willful-and-wanton negligence claim. The court granted summary judgment for GMAC Mortgage on the plaintiffs' willful-and-wanton negligence claim after finding that GMAC Mortgage promptly corrected the errors relating to the plaintiffs' account when it received notice of the plaintiffs' payment dispute, so that its conduct could not be deemed willful or wanton. The court found that the plaintiffs could not recover for breach of contract because the plaintiffs had purposely withheld their October 2004 mortgage payment and were themselves in breach.

## III. *Plaintiffs' RESPA Claims*

Plaintiffs contend that GMAC Mortgage violated RESPA in a number of ways, including failing to give notice of the transfer of their mortgage, failing to respond promptly to qualified written requests for information, and failing to correct wrong information provided to credit-reporting agencies. The district court did not reach the merits of those claims because it found

that GMAC Mortgage was entitled to the protection of
the RESPA safe harbor provision in 12 U.S.C. § 2605(f)(4).
We address first the safe harbor provision and then
the substantive claims.

A.  *RESPA's "Safe Harbor"*

Although RESPA provides a private right of action for
violations of its requirements, it also includes a non-
liability or "safe harbor" provision, which provides:

> A transferor or transferee servicer shall not be
> liable under this subsection for any failure to
> comply with any requirement under this section if,
> within 60 days after discovering an error (whether
> pursuant to a final written examination report or
> the servicer's own procedures) and before the com-
> mencement of an action under this subsection and
> the receipt of written notice of the error from the
> borrower, the servicer notifies the person concerned
> of the error and makes whatever adjustments are
> necessary in the appropriate account to ensure that
> the person will not be required to pay an amount
> in excess of any amount that the person otherwise
> would have paid.

12 U.S.C. § 2605(f)(4).

GMAC Mortgage is not entitled to the protection of
the safe harbor in section 2605(f)(4). Although the
parties have debated other requirements in the safe
harbor provision, GMAC Mortgage did not argue, and
nothing in the record shows, that GMAC Mortgage

"notif[ied] the person concerned of the error," as required to invoke the protection. On this basis alone, GMAC Mortgage was not eligible for protection in the RESPA safe harbor. The district court's finding otherwise was error.

In the district court, GMAC Mortgage argued that it was protected by the safe harbor because, when all was said and done, the plaintiffs did not pay any money in excess of what they otherwise would have paid, and GMAC Mortgage corrected all errors in the plaintiffs' account within 60 days after receiving the plaintiffs' December 17, 2004 letter, and before the plaintiffs filed suit. Under this view of the statute, the defendant must have corrected the error only before plaintiffs filed suit, even if the defendant did not discover and correct the error before receiving written notice of it from the borrower. Plaintiffs contend that the safe harbor provision requires the defendant to have corrected the error both before suit was filed and before the defendant received written notice of the error from the borrower. Because GMAC Mortgage's failure to provide notice keeps it out of the safe harbor in this case, we express no view on the district court's reasoning on this point.

B.  *The "Qualified Written Request" Issue*

The plaintiffs argue that the letters they sent on October 6, November 15, December 2, December 9 and December 17 were qualified written requests. They contend that GMAC Mortgage violated RESPA by re-

porting their account as delinquent to the credit bureaus within the 60-day window after each of those qualified written requests was received, and that GMAC Mortgage also failed to investigate properly or to take corrective action in response to the October 6, November 15, December 2 and December 9 qualified written requests.

RESPA defines a qualified written request as follows:

> For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—
>
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

GMAC Mortgage argues that the letters in question were not qualified written requests because the letters "do not identify an error in plaintiffs' account or provide any statement of the reasons plaintiffs believe their account was in error." GMAC Mortgage Br. 16.[3]

---

[3] Although GMAC Mortgage conducted an investigation and corrected the plaintiffs' account in response to their Decem-

(continued...)

Relying on several district court decisions, GMAC Mort-
gage contends that letters that "merely dispute a debt or
request information are not 'qualified written requests,'
and do not trigger the obligations under section 2605."
*Id.*, citing *Moore v. Federal Deposit Ins. Corp.*, 2009 WL
4405538, at *4 (N.D. Ill. Nov. 30, 2009) (plaintiffs' letters
requesting information regarding reinstatement of a
defaulted mortgage loan and the amounts of delinquent
mortgage payments due did not relate to "servicing" and
thus were not qualified written requests), *Champlaie v.
BAC Home Loans Servicing, LP*, 2009 WL 3429622, at *7
(E.D. Cal. Oct. 22, 2009) (plaintiffs' claim that lender
failed to respond in violation of RESPA was dismissed
because plaintiff did not allege that his written request
for rescission of the loan related to the servicing of
his loan and thus his communication was not a
qualified written request), *Keen v. American Home Mortgage
Servicing*, 664 F. Supp. 2d 1086, 1097 (E.D. Cal. 2009)
(plaintiff's demand to cancel trustee's sale of home and
for rescission disputed the validity of the loan but did
not dispute the servicing of the loan and was not a quali-
fied written request), *Pettie v. Saxon Mortgage Services*,
2009 WL 1325947, at *2 (W.D. Wash. May 12, 2009) (plain-
tiffs' "inquiry letter" disputing amount owed and re-
questing 26 sets of documents did not offer reasons for
their dispute and thus was not a qualified written

---

[3] (...continued)
ber 17th letter, it disputes whether that letter was a qualified
written request under the technical requirements of the stat-
ute. GMAC Mortgage Br. 17.

request under section 2605(e)(1)(B)); *MorEquity, Inc. v. Naeem*, 118 F. Supp. 2d 885, 900-01 (N.D. Ill. 2000) (letter seeking information about the validity of a loan and mortgage documents but making no inquiry as to the account balance or credit for periodic payments did not relate to "servicing" and was thus not a qualified written request). By GMAC Mortgage's argument, a lender would have no obligation to respond to a borrower who expressed her belief that her account was in error but was unable to provide specific reasons for that belief, an untenable result under the language of the statute.

RESPA does not require any magic language before a servicer must construe a written communication from a borrower as a qualified written request and respond accordingly. The language of the provision is broad and clear. To be a qualified written request, a written correspondence must reasonably identify the borrower and account and must "include a statement of the reasons for the belief of the borrower, *to the extent applicable*, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B) (emphasis added). Any reasonably stated written request for account information can be a qualified written request. To the extent that a borrower is able to provide reasons for a belief that the account is in error, the borrower should provide them, but any request for information made with sufficient detail is enough under RESPA to be a qualified written request and thus to trigger the servicer's obligations to respond. See 12 U.S.C. §§ 2605(e)(1)(a), (e)(2), and (e)(3); see also *Garcia v. Wachovia Mortgage Corp.*, 676

F. Supp. 2d 895, 909 (C.D. Cal. 2009) (when construed in light most favorable to borrower, letter was a qualified written request even though it did not contain a statement of reasons for borrower's belief of error; letter provided sufficient detail regarding "other information" being sought); *Rawlings v. Dovenmuehle Mortgage, Inc.*, 64 F. Supp. 2d 1156, 1162 (M.D. Ala. 1999) (plaintiffs' claims survived summary judgment where court found that descriptions of payments made to a prior servicer sufficiently stated plaintiffs' reasons for their belief that their account was in error and were qualified written requests). We turn to the disputed letters.

1.  *Letter of October 6, 2004*

The plaintiffs' October 6th letter included content that was clearly sufficient to be a qualified written request. The three-page letter described in great detail the difficulties the plaintiffs encountered at the hands of RBC. The letter recounted that their first payment was due in August 2003, but that RBC failed to process the plaintiffs' August payment in a timely manner, and that a discrepancy arose between the plaintiffs and RBC as to whether the plaintiffs had made their payments or not. The letter described how RBC raised the plaintiffs' monthly payment amount without informing them of the change, and that each of the plaintiffs' attempts to communicate with RBC was rebuffed until RBC at last acknowledged its error and dismissed its foreclosure action against the plaintiffs in July 2004. The letter then reported that RBC did not cash the plain-

tiffs' August and September 2004 payments, but that GMAC Mortgage returned the plaintiffs' September 2004 payment uncashed, even though that payment had been sent to RBC, and that GMAC Mortgage informed the plaintiffs that their September 2004 payment was insufficient to cover the amount they then owed on their mortgage account, which, according to GMAC Mortgage, was five months overdue. The plaintiffs, naturally, wrote this description of the history of their loan's servicing from their perspective, and without access to the (incorrect) information that GMAC Mortgage had acquired from RBC. But the letter was certainly a thorough statement of "the reasons for the belief of the borrower, to the extent applicable, that the account is in error" under section 2605(e)(1)(B).

The letter then continued, requesting very specific information. Plaintiffs asked that RBC explain why it had cashed the checks they had sent in July if, as they had been told by GMAC Mortgage, RBC had sold their account to GMAC Mortgage in May. The letter also sought an accounting of the funds plaintiffs had paid in July and sought information related to the transfer— specifically, why RBC had not forwarded their checks to GMAC Mortgage, why GMAC Mortgage had delayed initiating contact with them after purchasing their account, and why GMAC Mortgage would purchase a "nonperforming" mortgage. Some of this information might have been "unavailable or [unable] to be obtained by the servicer" under section 2605(e)(2)(C), but whether the information the plaintiffs sought was unavailable or whether their questions were unan-

swerable does not negate the fact that they had "provide[d] sufficient detail to the servicer regarding other information sought by the borrower" under section 2605(e)(1)(B). Their October 6th letter was a qualified written request, and GMAC Mortgage was obligated to respond.

Of course, the plaintiffs did not send their October 6, 2004 letter directly to GMAC Mortgage. They sent it to HUD, which forwarded it to GMAC Mortgage. The statute requires that qualified written requests be received "from the borrower (or an agent of the borrower)." 12 U.S.C. § 2605(e)(1)(A). We do not have difficulty interpreting that requirement, under the circumstances of this case, to include HUD's intercession on the plaintiffs' behalf. RESPA is a consumer protection statute, and on summary judgment we must view the facts in the plaintiffs' favor. Here, the record amply demonstrates that the plaintiffs had exhausted every reasonable avenue in their communications with RBC, yet in the fall of 2004, they were back in the same nightmare with a different company. Again they were being accused of not paying their mortgage, and again they were being threatened with foreclosure. Their confusion and desperation at this point were palpable, and they reasonably sought help from HUD. Besides, when it received the plaintiffs' letter, GMAC Mortgage tacitly acknowledged that the letter was a request for information and raised a dispute with their account. After all, in its response to HUD, GMAC Mortgage provided a detailed accounting of the history and transfer of the

plaintiffs' mortgage and captioned its letter as a response to the plaintiffs' "payment dispute." After the months the plaintiffs had spent writing to and getting nowhere with RBC, and due to the fact that GMAC Mortgage received the plaintiffs' October 6th letter and treated it as a payment dispute and as a request for information, the fact that GMAC Mortgage received the letter from HUD and not directly from the plaintiffs does not prevent the plaintiffs' October 6th letter from being a qualified written request under RESPA.

   2.  *Letter of November 15, 2004*

In the plaintiffs' November 15th letter, they explained their understanding that, based on information they had received from GMAC Mortgage, there were seven payments due on their mortgage of $1,598 each, for a total of $11,186. A check for that amount was enclosed with the letter. The plaintiffs also set forth their expectations for how GMAC Mortgage would handle their account going forward, including that GMAC Mortgage would provide any information they request, that any requested information and any changes to their account would be in writing, and that their mortgage payments would be applied in a timely manner. However, the plaintiffs did not raise any disputes or errors in their account, and their "expectations" were not requests for information. We cannot construe the plaintiffs' November 15th letter as a qualified written request under RESPA.

### 3. *Letter of December 2, 2004*

In the plaintiffs' letter of December 2nd, they explained that they sent a check to GMAC Mortgage for $11,186 on November 26, 2004, which GMAC Mortgage had not yet cashed. Their letter requested that GMAC Mortgage cash their check and apply the funds to their account because "it becomes a major disruption to have large sums of money unaccounted for." Although this letter certainly pertained to the servicing of their account, the plaintiffs were not requesting information and were not stating a belief that their account was in error. The plaintiffs were requesting that GMAC Mortgage process their payment more quickly, but in and of itself, that request does not seem to be based on any belief that an underlying error was causing the delay. The plaintiffs' December 2nd letter was not a qualified written request under RESPA.

### 4. *Letter of December 9, 2004*

The plaintiffs' letter of December 9th was similar to their letter of December 2nd. They recounted how GMAC Mortgage returned their August and September 2004 mortgage payments and how they sent a check for $11,186 in response to GMAC Mortgage's statement that $9,843 was necessary to bring the plaintiffs' account current. They stated that GMAC Mortgage's "refusal to process this check when only having an association with the account for two months raises questions in our minds about your motivation for acquiring our account," and that:

the chaotic state that existed when you acquired the account was a direct result of the extreme mis-management of our account by RBC. However your actions also give me pause to wonder if your interest is more in acquiring our home than servicing the account. Additionally, it is extremely questionable as to why your company would assume an account that appeared to be in as severe disarray as the one received from RBC.

The plaintiffs then asked for "quick resolution of what-ever issues remain since the transfer of this account to your company by processing this and all future pay-ments immediately." Although the plaintiffs were under-standably frustrated that GMAC Mortgage had not yet cashed their $11,186 check and applied that amount to their account, we do not interpret the plaintiffs' Decem-ber 2nd letter as a statement of their belief that GMAC Mortgage's servicing of their account was in error. Again, their letter expressed their desire that GMAC Mortgage process their payment more quickly, which is not a statement of error or a request for infor-mation. They also hinted at "issues" remaining since GMAC Mortgage acquired their account from RBC, but we cannot reasonably construe the plaintiffs' use of the word "issues" as a statement of error, or as a request for information. The plaintiffs' December 9th letter was not a qualified written request.


   5.  *Letter of December 17, 2004*

   The plaintiff's December 17th letter was unequivocally a qualified written request under RESPA. The first sen-

tence of the letter said: "I am disputing your attempt to collect on the above referenced account." The plaintiffs stated that they had sent GMAC Mortgage the full amount required to bring the account current, but by then GMAC Mortgage had returned their $11,186 check and had advised them that it was seeking foreclosure against them. Against this backdrop, the plaintiffs' statement that GMAC Mortgage had "refused to process checks to alleviate any unnecessary actions or undue harm" was a statement of their belief that their account was in error.[4] They also very clearly requested specific information regarding their account—namely, an explanation of how their account balance increased from $229,098 to $248,298 over a two-month time span. The December 17th was also a qualified written request.

Having found that the plaintiffs' October 6th and December 17th letters were qualified written requests under RESPA, we leave it to the district court to resolve on remand whether GMAC Mortgage satisfied its obligations to investigate and respond under 12 U.S.C. §§ 2605(e)(1)(A) and 2605(e)(2) and to refrain from reporting the plaintiffs as delinquent to the credit reporting bureaus under 12 U.S.C. § 2605(e)(3). On remand, the district court will also need to consider the plaintiffs' claims that GMAC Mortgage violated

---

[4] The context explains why this December 17th letter was a qualified written request and the plaintiffs' December 2nd and 9th letters were not, even though all three expressed the plaintiffs' belief that GMAC Mortgage had failed to process their payments in a timely manner.

RESPA by not sending them an appropriate notice that their loan had been transferred and by charging them late fees within 60 days of the transfer. See 12 U.S.C. § 2605(c) (requiring transferee servicer to notify the borrower of the transfer within 15 days of the effective date of transfer, with certain exceptions); 12 U.S.C. § 2605(d) (prohibiting transferee servicer from imposing a late fee if borrower's payment is received by the transferor servicer before the payment due date). Summary judgment for GMAC Mortgage on the plaintiffs' RESPA claims is reversed, and we remand to the district court for further proceedings.

## IV. *Common Law Claims*

### A. *Breach of Contract*

The plaintiffs also claimed that GMAC Mortgage breached the mortgage-and-note contract when it refused to accept the payments they sent on September 27, 2004 and November 15, 2004.[5] The district court dismissed the plaintiffs' breach of contract claim on summary judgment. The court found that the plaintiffs had purposely withheld their October 2004 payment and that this withholding was itself a breach. We agree with plaintiffs that this was an error.

---

[5] On reply, the plaintiffs abandoned their argument that regulations of the Department of Housing and Urban Development were incorporated into their mortgage contract, and that those regulations provided an independent basis for their breach of contract claims. Pl. Reply 6, n. 6.

GMAC Mortgage does not dispute that it refused the plaintiffs' September 27th and November 15th payments and did not immediately apply those payments to the plaintiffs' debt. It argues instead that its failure to do so did not amount to a breach of the contract. Nothing in the contract required GMAC Mortgage to apply the payments according to any sort of schedule, it argues, and it attempts to reframe the plaintiffs' breach of contract claim as nothing more than a "gripe" that the payments "were not applied as plaintiffs would have liked," pointing out that in time, all of the plaintiffs' payments were applied properly. GMAC Mortgage Br. 25.

To swallow GMAC Mortgage's argument, we would have to accept, as a matter of law, that a lender is free to refuse a tendered payment and then to hold the bor-rower responsible for having failed to make the pay-ment. We would have to accept, as a matter of law, that it does not matter if a holder of a promissory note with-out a specified time period for its own performance performs its obligations under the contract in a *reasonable* time, so long as the party performs its obligations . . . eventually. We do not accept that argument. It is a basic tenet of contract law, recognized in Illinois, that where no time for performance is specified, the law implies a reasonable time. See *In re Marriage of Tabassum and Younis*, 881 N.E.2d 396, 408 (Ill. App. 2007); *Rose v. Mavrakis*, 799 N.E.2d 469, 475 (Ill. App. 2003); *Meyer v. Marilyn Miglin, Inc.*, 652 N.E.2d 1233, 1239 (Ill. App. 1995). Whether or not GMAC Mortgage's delay in applying the plaintiffs' payments was reasonable—especially when GMAC Mortgage was claiming that plaintiffs

were in breach by failing to make those same pay-
ments—is an issue of material fact that precludes sum-
mary judgment for GMAC Mortgage on the claim.

GMAC Mortgage also argues that its breach should be
excused because the plaintiffs breached the contract first
when they failed to remit their October 2004 payment.[6]
True, another general tenet of contract law is that plain-
tiffs cannot succeed on a breach of contract claim unless
they demonstrate their own performance of the con-
tract's requirements. See *Hukic v. Aurora Loan Services*, 588
F.3d 420, 433 (7th Cir. 2009); *Solai & Cameron, Inc. v.
Plainfield Community Consolidated School Dist. No. 202*,
871 N.E.2d 944, 953 (Ill. App. 2007) ("'under general
contract principles, a material breach of a contract provi-
sion by one party may be grounds for releasing the
other party from his contractual obligations'"), quoting
*Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 95 (Ill.
2006); *Borys v. Rudd*, 566 N.E.2d 310, 315 (Ill. App. 1990)

---

[6] GMAC Mortgage also contends that the plaintiffs had ten-
dered some earlier payments to RBC that were returned for
insufficient funds. GMAC Mortgage Br. 28, citing GMAC
Mortgage Ex. 89, ¶ 3. It is unclear whether those checks bounced
because the plaintiffs had insufficient funds to cover the
checks or, as counsel for plaintiffs asserted at oral argument,
whether the checks were not processed for some other reason
related to RBC's servicing of the plaintiffs' account. We cannot
resolve this issue on summary judgment, even if GMAC
Mortgage had explained how the plaintiffs' alleged failure to
remit payments to RBC would excuse GMAC Mortgage's
subsequent breach.

(only material breach of a contract provision will justify non-performance by the other party). The plaintiffs were certainly obligated to make timely payments under the note-and-mortgage contract. But the servicers had their own obligations under the contract, one of which was to provide timely and accurate information about where and to whom those payments should be sent in the event of a transfer. Such notice was also required under RESPA. See 12 U.S.C. §§ 2605(b) and (c). On these facts, which party breached first is not a question with a clear answer. A reasonable jury could find that the plaintiffs' failure to submit their October 2004 payment in a timely manner was justified by earlier wrongs by RBC Mortgage and GMAC Mortgage.

In September 2004, GMAC Mortgage assumed the plaintiffs' mortgage from RBC, but the plaintiffs were not informed of the transfer. Not knowing that GMAC Mortgage was their new mortgage holder, the plaintiffs sent their September payment to RBC. That payment was later returned to the plaintiffs uncashed, not by RBC but by GMAC Mortgage, along with a letter informing them that they owed not one payment but five, relying on inaccurate information from RBC. When, on October 15th, GMAC Mortgage told the plaintiffs that they could bring their account current by paying $9,588, the plaintiffs paid $11,186—a check that GMAC Mortgage again returned, uncashed. (Why GMAC Mortgage did not accept the plaintiffs' September and November checks as partial payment of the total amount it believed the plaintiffs owed is not explained by the parties and remains a mystery.) A rea-

sonable jury could conclude that the plaintiffs were doing their best to hold up their end of the bargain— after all, they were not squandering their uncashed mortgage payments, and in November they were able to send GMAC Mortgage more than it asked for. A jury could also find that plaintiffs' attempts were thwarted, first by RBC's and then by GMAC Mortage's misman-agement of their account. Given the plaintiffs' under-standable confusion and frustration with the servicing of their loan in the fall of 2004 and GMAC Mortgage's mixed messages regarding how they might fix the prob-lems, a reasonable jury could conclude that the plaintiffs' failure to submit their October 2004 payment to GMAC Mortgage was excused.

GMAC Mortgage cites our decision in *Hukic*, arguing that *any* misstep by a borrower in performance of the contract absolves a lender from liability for a later breach of the contract. We do not read *Hukic* so broadly. Hukic paid his property taxes and insurance directly, as his mortgage contract permitted him to do so long as he also submitted proof of payment to his mortgage company (or companies—Hukic's mortgage was also transferred from one servicer to another several times). *Hukic*, 588 F.3d at 425. This he failed to do despite his servicers' repeated requests for the required proof. Because they were unaware that Hukic had already paid those items, the mortgage servicers also paid them, which put Hukic's mortgage account in arrears. Hukic brought suit against the servicers for breach of contract. We upheld summary judgment for the mort-gage servicers, finding that Hukic had breached the contract by not informing the companies that he had

paid the property taxes and homeowner's insurance, as he was contractually obligated to do. *Id*. at 433. Hukic's failure to comply with his contractual obligations was material and absolved the servicers from liability because it directly caused the servicers' actions that were the basis of his own breach of contract claims. There was no issue in *Hukic* concerning whether or not Hukic's breach was excusable.

Here, even assuming that the plaintiffs delayed in making their October payment as GMAC Mortgage contends, that delay did nothing to exacerbate the already serious problems with GMAC Mortgage's servicing of the plaintiffs' mortgage account. Their delay in submitting their October 2004 payment, viewed in light of RBC's and GMAC Mortgage's repeated failures to provide them with information regarding their account or to conduct an investigation into the errors in transferring their account, is not comparable to Hukic's stonewalling. A reasonable trier of fact could find that the plaintiffs' failure to remit their October 2004 payment in a timely manner, although a breach of the contract, was excused due to the lenders' earlier breaches and errors and the resulting confusion surrounding their account. Summary judgment for GMAC Mortgage on the plaintiffs' breach of contract claim is reversed.

### B. *Negligence*

Finding that GMAC Mortgage promptly corrected the errors in the plaintiffs' account, the district court held that GMAC Mortgage could not be found to have acted willfully or wantonly for its own financial gain, and the

court dismissed the plaintiffs' consolidated negligence claims on summary judgment. The plaintiffs appeal. They describe their negligence claims as "willful and wanton negligence or negligence based on willful or wanton misconduct." They argue that, however described, the issue of willfulness or wantonness is one for a jury and that the trial court erred in dismissing their negligence claims.

Plaintiffs are foreclosed from recovering on their negligence claims under the economic loss doctrine, which bars tort recovery for purely economic losses based on failure to perform contractual obligations. See *Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443, 448-49 (Ill. 1982). In *Moorman*, the Illinois Supreme Court found that contract law protects the contracting parties' expectation interests and "provides the proper standard when a qualitative defect is involved," so a contracting party may not "recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation." *Id.* at 448, 453. Illinois recognizes three general exceptions to the doctrine, which its Supreme Court recently set forth as follows: "(1) where the plaintiff sustained damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.*, fraud; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions.*" First Midwest Bank, N.A. v. Stewart Title Guaranty Co.*, 843 N.E.2d 327, 333-34 (Ill. 2006) (internal citations

omitted). These exceptions have in common the existence of an extra-contractual duty between the parties, giving rise to a cause of action in tort separate from one based on the contract itself.

The plaintiffs do not argue that their negligence claim falls into one of the three recognized exceptions, but they attempt to fashion a duty from the note-and-mortgage contract, from common law, and from GMAC Mortgage's obligations under RESPA. See Pl. Reply Br. 8-15. However, each duty that the plaintiffs identify has its root in the note-and-mortgage contract itself. No matter GMAC Mortgage's failings, the contract itself cannot give rise to an extra-contractual duty without some showing of a fiduciary relationship between the parties. See *Judd v. First Federal Sav.& Loan Ass'n of Indianapolis*, 710 F.2d 1237, 1241-42 (7th Cir. 1983) (holding under Indiana law that mortgage contract did not create a trust requiring the mortgagee to account to the mortgagors as beneficiaries, nor did it transform a traditional debtor-creditor relationship into a fiduciary relationship); *Ploog v. HomeSide Lending. Inc.,* 209 F. Supp. 2d 863, 874-75 (N.D. Ill. 2002) (denying lender's motion to dismiss borrower's negligence claim because lender's duty to manage escrow funds properly could give rise to fiduciary relationship between lender and borrower); *Choi v. Chase Manhattan Mortgage Co.,* 63 F. Supp. 2d 874, 885 (N.D. Ill. 1999) (same). The plaintiffs have made no such showing, and the trial court's dismissal of their negligence claims is affirmed.

V.  *Damages*

We are not quite done yet. GMAC Mortgage argues in the alternative that even if plaintiffs' claims survive summary judgment on the issues already addressed, their RESPA and breach of contract claims cannot survive because they do not have competent evidence of damages. The district court did not address the question of damages. In doing so now, we conclude that the plaintiffs have raised disputed issues of material fact that bar summary judgment on this basis.

Plaintiffs must come forward with evidence sufficient to support an award of actual damages to pursue their RESPA and breach of contract claims. RESPA allows for damages in an amount equal to the sum of:

> (A) any actual damages to the borrower as a result of the failure; and

> (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000.

12 U.S.C. § 2605(f)(1). The plaintiffs do not contend that GMAC Mortgage engaged in a "pattern or practice" of noncompliance, and so to prevail under RESPA they must prove actual damages. Damages are also an essential element of their surviving breach of contract claim. See *Akinyemi v. JP Morgan Chase Bank, N.A.*, 908 N.E.2d 163, 169 (Ill. App. 2009) (dismissal of breach of contract claim upheld where plaintiff pled only that he "suffered damages in an amount to be proven at trial").

The plaintiffs contend that, as a result of GMAC Mortgage's conduct, they were denied home-equity lines of credit and a small business loan, and that they suffered emotional distress.[7] Keeping in mind the standard applicable for summary judgment, we review the relevant evidence in the light reasonably most favorable to plaintiffs as the non-moving parties.

### A. *Denials of Credit Applications*

While the issues with plaintiffs' mortgage were still ongoing, they applied for four home equity lines of credit, three with LaSalle Bank and one with Quicken Loans. Plaintiff Morris also applied for a business loan with First American Bank. Each of these applications was denied. In response to the plaintiffs' contentions that they were denied loans and credit lines as a result of GMAC Mortgage's actions, GMAC Mortgage counters that no admissible facts support the plaintiffs' claim that they were denied credit as a result of GMAC Mortgage's report of negative information to the credit bureaus.

A representative of LaSalle Bank testified that the bank's decisions to deny the plaintiffs' applications of December 1, 2004, March 7, 2005, and October 14, 2005 would have been no different regardless of the issues between

---

[7] The plaintiffs offer no response to GMAC Mortgage's argument that their damages claims relating to loans made by plaintiff Morris's mother should be dismissed. Accordingly, that damages theory is not available on remand.

RBC, GMAC Mortgage, and the plaintiffs. The plaintiffs presented contrary evidence. Morris testified that a LaSalle Bank loan officer told her that the plaintiffs' home-equity loan applications would not be approved until their foreclosure was removed.

GMAC Mortgage argues that the plaintiffs' evidence about what the LaSalle Bank loan officer said is not sufficient to avoid summary judgment because it is "classic" hearsay. We disagree. Hearsay, of course, is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The loan officer's statement to Morris was not hearsay. It was not an assertion of a factual matter but a statement describing the bank's collective intentions: we won't approve a loan until you get the foreclosure issue resolved. There is also an exception to the exclusion of hearsay for "a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." Fed. R. Evid. 803(3); see *Citizens Financial Group, Inc. v. Citizens National Bank*, 383 F.3d 110, 133 (3d Cir. 2004) (bank tellers' statements regarding their personal experiences with certain customers were not hearsay because the tellers described the actions they took with regard to those customers and why); *United States v. Heath*, 970 F.2d 1397, 1404 (5th Cir. 1992) (statement by vice president and loan officer of bank that he was concerned a loan was a sham was not hearsay; his statement was offered not to show that the loan was a sham but to reveal whether the loan had aroused the witness's suspicions and whether

the witness had notified any other bank officer about it); *United States v. Visa U.S.A., Inc.*, 2007 WL 1741885, at *9 (S.D.N.Y. June 15, 2007) (statements of bank employees regarding the banks' reasons for dealing with one supplier rather than another were not hearsay). Also, because the loan officer was speaking during the employment relationship concerning matters within the scope of her employment, her statement may be imputed to the bank. Thus, the LaSalle loan officer's statements to plaintiff Morris about the need to resolve the mortgage problem were expressions of the intentions of the bank made by its representative. The statements fall outside the definition of hearsay, and even if they amounted to hearsay, the Rule 803(3) hearsay exception would apply. The testimony from Morris about the bank representative's statements is admissible. The evidence presented by the parties presents a disputed issue of material fact that bars summary judgment on this issue.

The plaintiffs also applied for a fourth home equity loan with Quicken Loans in October 2005. The denial letter informed them that their application was rejected because of their poor credit scores. GMAC Mortgage argues that the denial of this loan cannot be attributed to its conduct because a different lender pulled the plaintiffs' credit report on the same day that Quicken did, and the report relied on by the other lender showed only positive information being reported by GMAC Mortgage on that date. However, without additional evidence to connect the dots, there is no way to conclude beyond

reasonable dispute that Quicken did not rely on the negative and erroneous credit information that GMAC Mortgage had reported to the credit bureaus only five months earlier. GMAC Mortgage's unbolstered assumption is speculative and insufficient to support summary judgment.

The plaintiffs support their claim that Morris was denied a business loan through First American Bank due to GMAC Mortgage's actions with an email sent by a representative of the bank to a First American loan officer expressing concern regarding Morris's "mortgage situation."[8] GMAC Mortgage argues that the representative who sent that email later testified that Morris's application was denied for reasons having nothing to do with GMAC Mortgage. GMAC Mortgage's argument goes to weight, not admissibility, and does not resolve this dispute of material fact. Taken in the light most favorable to the plaintiffs, a reasonable jury could conclude that GMAC Mortgage's actions resulted in

---

[8] The plaintiffs also argue that a "former" First American loan officer told Morris that her business loan was denied due to the foreclosure. Although the plaintiffs disclosed this former First American loan officer to GMAC Mortgage as a potential witness, neither Morris's deposition testimony nor any other evidence in the record supports the plaintiffs' assertion of this statement. Even assuming that the loan officer made this statement to plaintiff Morris, there is no indication that she made the statement during the time she was an agent of the bank, so the statement has not been shown to be admissible.

plaintiff Morris's business loan application being denied.[9]

B.  *Emotional Distress Damages*

Regarding the plaintiffs' claim of emotional distress, Plaintiff Morris's medical records indicate that she was under increased stress during this time period because of her "house situation." Also, both of the plaintiffs testified regarding their emotional distress. Plaintiff Morris explained:

> It is hard to feel like people aren't listening to you, that they're ignoring you. It makes me nervous. It makes me shaky. It depresses me. It concerns me. It embarrasses me.
>
> I can't sleep. I don't like people ringing my doorbell. Any and every way that you should feel in your own home, I don't feel, and only now are we really starting to do things in our house because I was concerned that it wasn't going to be my house. . . . It makes me sad because I've taken time away from my husband and from my child and from

---

[9] In the long run, of course, simply being denied a loan that would have to be repaid would not be sufficient by itself to prove damages; the plaintiffs would need to show further damages resulting from the loan denial. As the case comes to us, however, those issues are not before us. We focus only on the threshold step of whether the loans were denied as a result of GMAC Mortgage's actions.

myself because I have been consumed with this and dealing with this, and I'm angry about it.

I understand to an extent that [GMAC Mortgage] inherited an issue that was preexisting, but it seemed like [GMAC Mortgage] jumped on the bandwagon and didn't listen, ignored what was said to you.

I get headaches thinking about it and dealing with it. I'm just tired of it.

And, plaintiff Catalan testified:

If I see my wife upset, I can't let her know that I'm upset. So the whole time that we were going through this process, I had to deal with my wife every day crying and being upset, not being able to take care of my son the way she was supposed to. And I had to take care of my son . . . try to console my wife, and at the same time, I couldn't let anybody know how I felt about it.

. . . .

Every day I just felt useless. I couldn't do anything to help her. I couldn't resolve the situation. I couldn't fix her problem.

. . . .

It was killing me every day.

GMAC Mortgage concedes that emotional distress damages are available as actual damages under RESPA, at least as a matter of law, but argues that the plaintiffs's evidence is not sufficient to support a damages

award because it did not show "extreme" emotional distress and was "self-serving and conclusory." GMAC Mortgage Br. 35, 36. We disagree. Although not extensive, the plaintiffs' testimony is not conclusory. They described their emotional turmoil in reasonable detail and explained what they believe to be the source of that turmoil. Although also "self-serving," most testimony by a party is, see, *e.g.*, *Payne v. Pauley*, 767, 772 (7th Cir. 2003) (reversing summary judgment), so that characterization does not assist GMAC Mortgage. So long as the statements were made with personal knowledge, which they certainly were, plaintiffs' testimony on this point is admissible. GMAC Mortgage will be free to argue on remand that any such distress was minor and that other stressors in the plaintiffs' lives were the true causes of their distress, but the plaintiffs' testimony is sufficient to preclude summary judgment for GMAC Mortgage on the question of whether the plaintiffs suffered emotional harm as a result of GMAC Mortgage's actions—and inaction.[10]

---

[10] Before leaving the issue of damages, recall that plaintiffs already won a judgment for $11,100 against RBC Mortgage. To the extent that plaintiffs are seeking damages against GMAC Mortgage for any of the same injuries, on remand the district court will need to ensure that plaintiffs do not recover twice for the same injury.

*Conclusion*

The district court's grant of summary judgment for GMAC Mortgage on the plaintiffs' RESPA claims and breach of contract claim is REVERSED and REMANDED for further proceedings. The court's grant of summary judgment to GMAC Mortgage on the plaintiffs' negligence claims is AFFIRMED.