In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 11-2928 & 11-3378

BKCAP, LLC, GRAYCAP, LLC, and SWCAP, LLC,

*Plaintiffs-Appellees*,

*v.*

CAPTEC FRANCHISE TRUST 2000-1,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:07-cv-00637—**Roger B. Cosbey**, *Magistrate Judge*.

ARGUED MAY 31, 2012—DECIDED AUGUST 3, 2012

Before BAUER, SYKES, and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. Quality Dining, Inc. owns dozens of restaurants in several states, including Michigan, Indiana, and Pennsylvania. To refinance its debt, Quality Dining created subsidiaries (the plaintiffs-appellants or "Borrowers") and made a deal with Captec Financial and GE Capital for 34 separate loans totaling $49 million, with each loan secured by a restaurant. Captec

Financial assigned 13 of its loans to Captec Franchise Trust 2000-1 (the defendant-appellee or "Lender"). The parties disagree about the prepayment requirements for 12 of those loans. This is the second time we have seen this dispute, but the basic issue in this appeal is the same as it was in the first: According to the loan agreements, what is the prepayment penalty? In the first appeal, the ambiguity of the prepayment provision made answering that question impossible. In this appeal, we have the benefit of a full trial on the merits.

Because this appeal is successive, we keep the background to a minimum. Interested readers should consult our previous opinion. *BKCAP, LLC v. Captec Franchise Trust 2000-1*, 572 F.3d 353, 355-57 (7th Cir. 2009) ("*BKCAP-1*"). In a nutshell, then, here is what happened: The Borrowers prepaid all the loans except those held by the Lender, and they did so according to their own interpretation of the prepayment provision. The other lenders and holders' acceptance of the Borrowers' interpretation of the prepayment provision, however, did not convince the Lender that the Borrowers were interpreting it correctly, and they rejected prepayment. In response, the Borrowers filed a complaint seeking a declaratory judgment and alleging breach of contract.

In 2008, the parties moved for summary judgment. Magistrate Judge Nuechterlein faced the unenviable task of parsing the notes' key provision, which states that the prepayment premium is

> equal to the positive difference between the present value (computed at the Reinvestment Rate)

of the stream of monthly payments of principal and interest under this Note from the date of the prepayment through the tenth (10th) anniversary of the First Full Payment Date at the Stated Rate . . . and the outstanding principal balance of this Note as of the date of the prepayment (the "*Differential* "). In the event the Differential is less than zero, the Prepayment Premium shall be deemed to be zero. . . .

Unembellished, this provision always generates a negative number, and so a prepayment premium of zero. *Id.* at 359. But some penalty was obviously intended. To help Magistrate Judge Nuechterlein decide exactly what, the parties suggested a couple imaginative readings. The Lender argued that the premium is the difference between

(1) the present value of the stream of monthly payments from the date of prepayment through year 10, *plus* the outstanding principal balance at year 10; and

(2) the outstanding principal balance at the date of prepayment.

The Borrowers saw it rather differently. They argued the premium is the difference between

(1) the present value of the stream of monthly payments from the date of prepayment through year 10 computed at the Reinvestment Rate; and

(2) the present value of the same stream of monthly payments computed at the Stated Rate of the Note.

The court thought that the Lender had the better interpretation and granted its motion for summary judgment. On appeal, we concluded that there was no way to get *either* the Lender's or the Borrowers' interpretation from the text alone, and so we reversed and remanded for the district court to consider extrinsic evidence to resolve the ambiguity. *BKCAP-1* at 362.

After a bench trial, the district court (Magistrate Judge Cosbey, this time) concluded that extrinsic evidence supported the Borrowers' interpretation of the prepayment premium. *BKCAP, LLC v. Captec Franchise Trust*, No. 3:07-cv-637, 2011 WL 3022441 (N.D. Ind. July 21, 2011). In response to the Borrowers' Rule 59 motion, Judge Cosbey amended the judgment to include prejudgment interest. *BKCAP, LLC v. Captec Franchise Trust*, No. 3:07-cv-637, 2011 WL 4916573 (N.D. Ind. Oct. 14, 2011). And, also relevant to this appeal, he had previously explained why the Lender is not entitled to have its attorney's fees paid by the Borrowers. *BKCAP, LLC v. Captec Franchise Trust*, 701 F. Supp 2d 1030 (N.D. Ind. 2010). The Lender appeals everything, and on a variety of grounds. *See, e.g., Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 955 (7th Cir. 1996) (urging appellants to hunt for relief on appeal with a rifle, not a shotgun); *United States v. Lathrop*, 634 F.3d 931, 936 (7th Cir. 2011) (same; collecting cases).

The Lender's lead argument is that the district court's adoption of the Borrowers' interpretation of the prepayment provision is clearly erroneous because it is unreasonable. *Woodbridge Place Apts. v. Washington Square Capital*,

*Inc.*, 965 F.2d 1429, 1439 (7th Cir. 1992) ("Resolving the nature of an ambiguous contract through extrinsic evidence is a factual determination which is evaluated under the clearly erroneous standard."). According to the Lender, not only is that true as a matter of fact, but, based on what we said in *BKCAP-1*, it is the law of the case.

That argument is way off base. The basic point of *BKCAP-1* was that the meaning of the prepayment provision could not be resolved in favor of the Borrowers *or the Lender* based on the provision's language alone—its ambiguity prevented it—and so a trial was necessary. But it is true, as the Lender has been pleased to note, we did say that the Borrowers' interpretation was "unreasonable." *BKCAP-1* at 362. Having said that, however, we did not go on to conclude that the Lender's interpretation was reasonable or correct. To the contrary, we said:

> Although Lender's formula has the virtue of producing a positive Prepayment Premium, Lender's concept of a "balloon payment" finds no support in the contract language.

*BKCAP-1* at 360. We did not realize that our failure to use a parallel construction would cause such confusion. Let's clear that up now. Here is what we should have said: 'Although Lender's formula has the virtue of producing a positive prepayment premium, Lender's concept of a 'balloon payment' finds no support in the contract language . . . *and therefore, without additional evidence, it is an* **unreasonable** *construction of the provision, and so we cannot affirm summary judgment for the Lender.*' Fortunately

the district court was not confused. It understood that it was to consider extrinsic evidence to uncover the parties' intent and that nothing we said in the first appeal was intended to prejudice that determination.

The Lender next argues that the district court's interpretation is clearly erroneous because it does not achieve "yield maintenance." By that the Lender means that a yield maintenance provision must, by definition, *fully* compensate a lender for its losses from prepayment. The problem with the Lender's fixed-meaning (or yield-maintenance-by-definition-means-we-win) argument is that the evidence presented at trial overwhelmingly supports the opposite conclusion. For example, the Lender's lead negotiator testified that "yield maintenance" could mean a "couple different things" and an attorney who worked on the deal for the original lenders testified that it is a term "thrown around by borrowers or lenders or other parties as a general reference of some type of prepayment premium . . . that, in my view, typically requires more detail in terms of what that might be." In fact, every witness that was involved in the deal when the language was drafted agreed that "yield maintenance" lacked a mathematically precise definition. It refers to *a* prepayment premium or penalty, but it does not provide (at least not according to the evidence presented at trial) useful information about precisely *how* it should be calculated.

The Lender falls back again to argue that its reading is just better. To this, even if true, our response must be: *So what?* The question in this appeal (and the previous

one, for that matter) is not whether we like one of the two options better, as if a court reviewing this judgment is authorized to make that choice. And that was not the district court's job either, obviously. The district court's job was to look at extrinsic evidence and determine what the agreement was. It did that. Our job is to decide if the district court's view of that evidence was clearly erroneous (or legally wrong). The Lender's job on appeal, if it thinks the district court should be reversed, is to tell us how the district court's interpretation was clearly erroneous (or legally wrong). No matter how beautiful or elegant, the Lender's interpretation of the contested provision will never result in reversal of the district court unless the Lender can tell us how the district court erred in viewing the evidence the Borrowers' way. The argument, *'The Borrowers' position was supported by the evidence presented at trial but our interpretation is way, way better'* is a nonstarter. We are looking to correct error, not reward elegance.

Finally getting specific, the Lender argues that the district court should not have allowed the Borrowers' lead negotiator (John Firth) to testify about an original lenders' lead negotiator's (Robert Schrader's) construction of the prepayment provision. Firth, it seems, was still unclear at closing about the provision (small surprise, considering its language) and so Schrader took him aside to explain it. According to Firth, Schrader's interpretation was identical to the Borrowers': The premium was fixed as the difference between the value of payments from the date of prepayment through the tenth anniversary of the note at the *reinvestment rate*

and value of the same stream at the *stated rate*. As the district court put it, "at closing, Firth and Schrader understood and outwardly manifested their mutual contractual intent that to pay off a note within the first ten years, the Borrowers would have to pay a pre-payment premium based on this methodology, together, of course, with the outstanding principal balance of the note."

The district court considered Firth's testimony important and mentioned it several times in its opinions. If Firth's testimony is inadmissible, it is unlikely that its use was harmless, and the Borrowers do not make much of an effort to convince us otherwise. But they don't think they have to go down that road. They argue that the statement was not hearsay because it was offered as a statement of the parties' mutual intent and not to prove the truth of Firth's statement. Fed. R. Evid. 801(c). *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 694-95 (7th Cir. 2011), appears to support their view, and the district court relied on it in admitting the testimony.

In *Catalan*, the defendant mortgage company improperly reported to credit agencies that the plaintiff's home was in foreclosure. Those reports prevented the plaintiff from getting loans, including one from LaSalle Bank. A LaSalle Bank representative testified that the loan requested by the plaintiff would have been denied regardless of the improper reports about the foreclosure. The plaintiff, however, testified that a LaSalle Bank loan officer told her that the loan would not be approved until the foreclosure was removed. The defendant argued that the plaintiff's statement was inadmissible

hearsay, but we disagreed: "The loan officer's statement to [the plaintiff] was not hearsay. It was not an assertion of a factual matter but a statement describing the bank's collective intentions; we won't approve a loan until you get the foreclosure issue resolved." *Id.* at 694. Similarly, it was not an abuse of discretion for the district court to admit Firth's testimony: It was not offered for its truth, but as evidence of the parties' intentions at closing.

Those are the Lender's main arguments on appeal, but it presses a few more: The Borrowers' notice of intent to prepay was inadequate, the Lender's repudiation was not a breach, the Borrowers waived their breach claim because they kept paying on the notes, and the claims are moot. Magistrate Judge Cosbey addressed this blast of meritless arguments with admirable patience and attention to detail. We find nothing to criticize in his analysis and see no need to repeat it. *BKCAP¸* 2011 WL 3022441 at *11-*14 (bad notice, no-breach, waiver); *BKCAP, LLC v. Captec Franchise Trust 2000-1*, No. 3:07-cv-637, 2010 WL 2346323 (N.D. Ind., June 8, 2010) (mootness).

The Lender also appeals the district court's decisions on prejudgment interest and attorney's fees. The district court did not abuse its discretion in deciding either. First, prejudgment interest. There is no question that the Borrowers are entitled to prejudgment interest after September 2009. The question is whether they are entitled to prejudgment interest for the two years between their notice of intent to prepay and the ten-year anniversary of the loans (when they could prepay

without penalty). The district court concluded that they are. The Lender asserts (without explanation) that this would be double recovery. The Lender's idea seems to be that because the damage award is to compensate the Borrowers for excess interest payments—the higher rate the Borrowers had to pay because they were not permitted to prepay—the judgment is already prejudgment interest. But just because this case is, in essence, about interest does not mean that the Borrowers are not entitled to the time value of their money. A judgment stated in today's dollars does not give them that. To give them the time value of their money, the district court correctly awarded prejudgment interest from the time of their injury—October 2007.

We conclude, as often happens, with a discussion of attorney's fees. But the claim in this case is unusual: The Lender—the judgment loser—insists that the notes' reimbursement provision entitles it to fees, win or lose.

> 9. REIMBURSEMENT OF EXPENSES. Borrower shall reimburse Lender for all costs and expenses, including attorneys' fees, incurred by lender in enforcing the rights of Lender under this Note or the other Loan Documents.

But this cannot mean win or lose: "Enforcement" means more than just participating in a lawsuit—being sued. As the district court put it, "[enforcement] plainly contemplates an offensive, coercive act—such as filing a lawsuit after default—to compel observance or obedience. [It] presupposes that an act of disobedience (e.g., contractual non-compliance) has occurred." But the Borrowers did not

breach, and so the Lender is not enforcing anything. It claimed it was, but there was a trial to decide the issue and it lost (and we are affirming). Moreover, the parties understood the difference between enforcement of contractual rights and simple involvement in a lawsuit.

> 10. WAIVER OF JURY TRIAL. Each party . . . waives any right to trial by jury in the event of litigation regarding the performance or enforcement of, or in any way related to, this note or the indebtedness.

The waiver provision conspicuously includes not only "enforcement" but also litigation "in any way related to" the note. All the more reason to believe that enforcement requires some element of contractual noncompliance by the other party. The district court did not abuse its discretion by reading the reimbursement provision to mean that the Lender could not breach, force the Borrowers to sue on the notes, win in court, and then, despite their unqualified victory, still be required to cover the Lender's attorney's fees.

AFFIRMED.