NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted March 10, 2011[*]
Decided August 24, 2011

**Before**

DANIEL A. MANION, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 10-1126

| | |
|---|---|
| DAVID ELIJAH BOWERS, SR., | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Eastern District of Wisconsin. |
| *v.* | No. 01-C-975 |
| ELLIE SEYMOUR, et al., | Rudolph T. Randa, |
| *Defendants-Appellees*. | *Judge.* |

**O R D E R**

In this action under 42 U.S.C. § 1983, David Bowers has sued three nurses currently or formerly employed at the Milwaukee County House of Correction. (Bowers also sued a fourth nurse but did not substitute the nurse's estate when he later died). All three defendants dispensed phenytoin, an anti-convulsant drug marketed as Dilantin and in generic forms, during Bowers' incarceration at the Milwaukee jail from December 1999 through September 2000. At times Bowers refused the medication, and he told the nurses that he did not suffer

---

[*]After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and record. See Fed. R. App. P. 34(a)(2)(C).

from seizures and had no medical need for it. Bowers contends that each defendant ignored him when he protested that they were giving him the drug by mistake. As a result of receiving phenytoin, Bowers suffered severe dental side effects causing the loss of most of his teeth. He alleges that each of the defendants was deliberately indifferent to his serious medical needs, in violation of his constitutional rights. The district court initially dismissed Bowers's complaint at screening, but in 2002 we remanded for further proceedings. After extensive discovery, the district court granted summary judgment in favor of the defendants. Bowers appeals the judgment, and we affirm.

The relevant facts, which we construe in the light most favorable to Bowers, see *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 681 (7th Cir. 2011), begin in December 1999 when Bowers was extradited to Milwaukee from Detroit, Michigan. When Bowers arrived at the jail in Milwaukee County, he received a limited medical screening from former employee Joanne Retzlaff, a nurse who is not a defendant. In her deposition testimony, she recalled asking Bowers about his medical history and recording his responses, but conceded that she did not examine him except to check his blood pressure and sugar level. At that intake meeting, the deputy escorting Bowers handed over to Retzlaff the medications sent from the jail in Detroit: drugs for high blood pressure and diabetes, a prescription inhaler for bronchitis, and phenytoin under the name Dilantin. Bowers had been given a six-month prescription for each medication shortly after he arrived in the jail in Detroit. According to the intake form that Retzlaff prepared and Bowers signed at the jail in Milwaukee, he self-reported a history of seizure disorder. When deposed, however, Bowers denied telling Retzlaff that he suffered from seizures, and he insisted that she told him to sign the form without giving him a chance to read it. On appeal from summary judgment, we must give Bowers the benefit of this conflict in the evidence. After this screening, Retzlaff issued a directive that staff continue giving Bowers the medications he had been receiving in Detroit, and a jail physician approved the prescriptions. Defendant Ellie Seymour, a nurse practitioner, acknowledged at her deposition that frequently there is no follow-up examination after the initial screening.

Bowers immediately began receiving his prescribed medications, including phenytoin. His medical file confirms that each day he received drugs for high blood pressure and diabetes, as well as three doses of the phenytoin (either Dilantin or a generic). Bowers continued to receive these drugs for the duration of his 10-month stay. (In his complaint Bowers also alleged that during this same 10-month period he was receiving Paxil, an antidepressant, but his medical records reflect that he was not given an antidepressant (trazodone rather than Paxil) until 2001 at the Wisconsin Department of Corrections. In any event, Bowers did not produce evidence that his use of an antidepressant caused harm, so we need not say more about the Paxil.)

Beginning around January or February 2000, Bowers learned that one of the drugs he was taking was for seizures. He started sporadically refusing that medication. Several former nurses, including defendant Janise Johnson, explained in their depositions that they documented in Bowers' "medical administration record" or "MAR" the instances when he refused the seizure medication. An inmate's MAR is a chronological report of the drugs administered to him. Nurses carry the MARs when making rounds to dispense drugs. Bowers almost always accepted the phenytoin without complaint. The MARs show only about 25 recorded refusals of a medication that was administered three times a day for 10 months. Bowers maintains, however, that he often accepted the seizure medication because he could not differentiate it from his other drugs. (Diabetes has impaired his vision, and he is color-blind.) Bowers also testified at his deposition that he feared disciplinary action after he was placed in segregation for refusing medication in March 2000. (The defendants and other prison employees testified that inmates are not punished for refusing medication, but again, we give Bowers the benefit of the doubt at this stage.)

Bowers insists that when he refused the phenytoin, he told Johnson repeatedly that he did not suffer from seizures and should not be taking seizure medication. On August 31, 2000, Johnson documented in Bowers' MAR the explanation he gave for refusing phenytoin: "States no seizure history and did not know what medication was for." In her deposition, Johnson testified that she did not remember Bowers but could tell from looking at his MAR that he was supposed to receive phenytoin and that other nurses also had continued giving phenytoin to Bowers without receiving any complaints. Johnson also said that if she had been alarmed by Bowers' protests, she would have checked his chart or followed up with the prescribing physician. Neither of those steps, however, would have corroborated Bowers' assertion that the phenytoin was unnecessary: Johnson would have learned that Bowers had self-reported seizures and had indeed been prescribed phenytoin.

Bowers testified in his deposition that he also told Mary Kay Schuknecht, the third defendant who was then the health-care coordinator at the jail, that he did not suffer from seizures. According to Bowers, Schuknecht on several occasions had summoned him to her office to administer his medications. In her own deposition, Schuknecht testified that although she sometimes treated inmates, she generally did not distribute medications and did not remember ever interacting with Bowers. Schuknecht acknowledged that she would have reviewed any written medical request from Bowers, but she testified that she never encountered one.

Bowers first sought dental treatment nine days after arriving at the jail and continued submitting written requests for dental care, usually several per month, until September 2000. As a nurse practitioner, Seymour sometimes addressed Bowers' dental complaints. Her handwritten notes appear on at least three of the forms he submitted. But the forms say

nothing about wrongly receiving medication.  More than once she referred him to the prison dentist, who prescribed a treatment plan and performed several surgeries to extract teeth and cut back Bowers's gums.  At one point in August 2000, Bowers submitted a form addressed to the "cashier" asking that his co-payment for one of the dental visits be refunded. On that document he noted that his mouth had been "all [messed] up" by being "given the wrong medications for someone else."  Seymour and Schuknecht denied ever seeing this document. Seymour also disputed Bowers' deposition testimony that he told her in person that he should not be taking phenytoin, but again, we must accept Bowers' version at this stage of the case.

As of July 2005, dentists had extracted 17 of Bowers' teeth and recommended removing the rest. Several experts testified about the effects of phenytoin on Bowers' oral health. Phenytoin can cause gingival hyperplasia, an inflammation of the gums.  The experts agreed that Bowers already suffered from periodontitis, another type of gum inflammation that can be caused by poor oral hygiene, before he began experiencing gingivial hyperplasia.  They also agreed that giving Bowers seizure medication during his confinement at the Milwaukee jail contributed to the deterioration of his gums and the need to remove his teeth.

Bowers was transferred from the jail to the Wisconsin Department of Corrections at the end of September 2000.  After the move he apparently continued to receive phenytoin until March 2001.  At that time Bowers was prompted to go to the infirmary because another inmate had observed symptoms that he described to Bowers as a seizure.  Testing led the medical staff to conclude that Bowers had suffered what he calls a "sugar blank-out."  He was taken off phenytoin, and there is no evidence that the drug has been prescribed since.

In 2001 the district court dismissed at screening Bowers's claim of deliberate indifference under the Eighth Amendment, but we vacated the decision and remanded for further proceedings. *Bowers v. Milwaukee County Jail Med. Staff*, 52 F. App'x 295 (7th Cir. 2002).  The district court had misconstrued the complaint to allege that jail staff were indifferent to a *diagnosed* medical condition; the court did not say which condition but apparently meant Bowers's diabetes. *Id*. at 298.  In fact, however, Bowers has claimed all along that he was harmed by taking phenytoin even after jailers knew that the drug was not indicated.  The district court, at our urging, recruited counsel to represent Bowers.

When we last reviewed this lawsuit based entirely on Bowers's original pro se complaint, his theory appeared to be one of mistaken identity:  he alleged that jailers had confused him with two other men—his son, David E. Bowers, Jr., and a David A. Bowers—who were at the Milwaukee County jail at the same time.  Bowers produced evidence that these men were incarcerated at the same jail between December 1999 and September 2000, that his son was prescribed Paxil, and that David A. Bowers had a seizure after receiving incorrect medication.  Nonetheless, medical records show that plaintiff Bowers himself was prescribed

phenytoin in Detroit. If a mistake initially caused Bowers to receive phenytoin, that mistake occurred before he encountered anyone at the jail in Milwaukee.

After we remanded the case, Bowers amended his complaint to limit the defendants to Johnson, Seymour, Schuknecht, and the now-deceased nurse. On defendants' motion for summary judgment, the district court concluded that Johnson had responded appropriately because, according to the court, she had said during her deposition that her practice was to check an inmate's "chart" if there was a question about a medication being dispensed. The court reasoned that Johnson would have checked Bowers' chart on the day she documented his insistence that phenytoin was not indicated, and that Johnson "would have seen that he had been prescribed Dilantin [phenytoin] for a seizure disorder and that he was also taking the medication for that same purpose at his previous institution." As for Seymour, the court reasoned that she could not have been deliberately indifferent because she had sent Bowers to the dentist. The court said nothing about Schuknecht.

Bowers once again is before us pro se, and his appellate brief is sparse. The defendants construe his brief as arguing that he presented enough evidence to survive summary judgment, and that is a fair interpretation. Aided by his reply brief, we understand Bowers to argue more specifically that the defendants displayed deliberate indifference by failing to investigate his repeated assertions that he did not have a seizure disorder and should not be receiving an anticonvulsant. Our previous decision in this case established that receiving prescription drugs that are not medically indicated "is not a risk inherent in prison life," so that Bowers has a legally sufficient claim that the defendants exposed him to "an objectively serious risk to his future health." *Bowers*, 52 F. App'x at 298; see *Helling v. McKinney*, 509 U.S. 25 (1993) (recognizing that Eighth Amendment is violated by deliberate indifference to an objectively serious risk to inmate's future health). The defendants do not argue that Bowers actually had a medical need for phenytoin. On this record, a jury easily could find (a) that all three defendants dispensed to Bowers this powerful drug, which (b) contributed to the loss of many of his teeth.

The decisive issue is the element of deliberate indifference. To win reversal, Bowers must offer evidence that would allow a reasonable jury to find that Johnson, Seymour, and/or Schuknecht actually knew that dispensing phenytoin when not medically necessary was dangerous, *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008), yet disregarded that risk either deliberately or at least recklessly. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006).

We conclude that a jury could find that the defendants knew about the risk to Bowers. When the conflicting evidence is viewed in the light most favorable to Bowers, it presents a fact question for the jury concerning whether Seymour and Schuknecht knew that Bowers should

not be getting phenytoin. Although these two defendants said they could not recall Bowers telling them that phenytoin was not indicated, Bowers testified that he did. His testimony, which is corroborated by the depositions of his fellow inmates and by Johnson, could allow a jury to conclude that Bowers repeatedly notified Seymour and Schuknecht that he was receiving the wrong medication and that he had no history of seizure disorder. See *Wilson v. McRae's, Inc.*, 413 F.3d 692, 694 (7th Cir. 2005) (explaining that self-serving nature of party's affidavit does not make affidavit deficient). And Johnson's knowledge cannot be disputed; the note she wrote in the MAR establishes that she knew about the risk that Bowers was receiving a drug he did not need.

We turn, therefore, to whether a jury could find that the defendants responded to the knowledge of the risk with deliberate indifference. A reasonable response to the risk would absolve them from a finding of deliberate indifference. See *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006); *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Since the defendants are all medical professionals, Bowers must show that their responses demonstrated "an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 862-63 (7th Cir. 2011); *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *Johnson v. Doughty*, 433 F.3d 1001, 1018 (7th Cir. 2006). Johnson, Seymour, and Schuknecht are nurses, and "a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations." See *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). Unlike the plaintiff in *Berry*, Bowers did not exhibit any symptoms of illness and was not suffering due to ineffective medications.

Bowers did not present sufficient evidence from which a reasonable jury could conclude that the defendant nurses were required to question the orders of medical directors and treating physicians. The nurses were presented with an inmate who refused a medication 25 out of approximately 900 times that it was dispensed. That means that Bowers accepted anti-seizure medication more than 97 percent of the time. The responses of the defendants were reasonable or, at worst, negligent. See *Gayton v. McCoy*, 593 F.3d 610, 623 (7th Cir. 2010) (affirming summary judgment for one nurse: failure to check an inmate's chart to see if medications had been delivered was not deliberate indifference); *Duckworth v. Ahmad*, 532 F.3d 675, 679-80 (7th Cir. 2008) (affirming summary judgment for one doctor: failure to order one indicated test might have been negligence but not deliberate indifference). Johnson testified that she recorded a note in the MAR. And though she acknowledged that other steps could have been taken to investigate Bowers' complaints, a jury could not conclude that she disregarded a risk to his health simply because she did not undertake further action. Similarly, while a jury might conclude that Seymour and Schuknecht did little to respond to Bowers' complaints about medication, their actions do not show a recklessness to danger, see *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999), in light of the risk presented by Bowers' sporadic refusal of medication. To

the contrary, the fact that Seymour repeatedly examined Bowers and sent him to the dentist based on his complaints about his teeth shows that she was not ignoring Bowers.

We can assume that someone wrongly prescribed unneeded anti-seizure medication to Bowers. Under our system of laws for compensating violations of constitutional rights under 42 U.S.C. § 1983, however, a plaintiff like Bowers must prove an individual defendant's responsibility for a violation. Because Bowers arrived at the Milwaukee County Jail with the anti-seizure medication in hand, the original mistake did not occur at the Milwaukee County Jail. Perhaps if he had been given a more thorough intake examination, jail personnel would have discovered the problem. But on this record, none of these individual defendants were involved in prescribing the medications for Bowers, and a reasonable jury could not find that they were deliberately indifferent to the risks he faced.

Accordingly, the judgment of the district court is AFFIRMED.